## STANDARD SCALE & SUPPLY CO. et al. v. CROPP CONCRETE MACHINERY CO. et al.

(Circuit Court of Appeals, Seventh Circuit. April 15, 1925. Rehearing Denied May 28, 1925.)

No. 3337.

1. Patents ⟨⟩325—Permitting plaintiffs to recover reasonable cost of accountants' services in preparing statement of profits from patent infringing business from defendant's books not error.

Where defendants, in suit for accounting for profits on patent infringing business, twice failed to file accounts accurately showing such profits, as ordered by master pursuant to rule No. 63, it was not improper for master to direct that plaintiffs' accountants have access to defendant's books, and to permit plaintiff to recover reasonable value of such accountants' services while preparing statement of profits, in view of equity rule 8.

2. Patents ⟨⟩325—Permitting plaintiffs to recover per diem rate paid accountants while testifying in support of account prepared held error.

In suit for accounting of profits on patent infringing business, it was error to permit plaintiffs, who were employing accountants at a per diem rate to prepare statement of profits from defendant's books, to include in the cost of such service, which was charged to defendants, the per diem rate paid accountants while furnishing testimony in support of account.

3. Patents ⟨⟩325—In suit for accounting of profits, recovery of per diem rate accountants held unwarranted, in absence of finding of reasonable value of services rendered.

In suit for accounting of profits of patent infringing business, where accountants hired by plaintiffs at a per diem rate were given access to defendant's books for purpose of preparing statement of profits on defendant's failure to furnish such statement, after order pursuant to rule No. 63, it was error to permit plaintiff to recover the per diem rate paid such accountants without any determination as to reasonable value of their services.

4. Patents ⟨⟩318(6)—Manner of computing interest to be credited to defendant in suit for accounting of profits of patent infringing business approved.

In suit for accounting of profits on patent infringing business, interest on plant investment and equipment, with which defendant was entitled to be credited, held properly computed on appraised value of such assets, rather than on basis of their actual cost, less depreciation for wear and tear.

5. Patents ⟨⟩318(6)—Accounting infringer is entitled to deduct interest on investment or value of use of plant and facilities.

An accounting patent infringer is entitled to deduct, as element of cost of producing infringing article, what may be termed interest on investment or value of use of his plant and selling facilities, and use of excessive valua-

tion for purpose of allowing value of use in reduction of infringer's profits is not prejudicial error as to infringer.

**6. Patents ⟲318(4) — Manner of allocating interest on investment between infringing and noninfringing business in suit for accounting of profits approved.**

In action for accounting of profits of patent infringing business, allocating interest on defendant's investment in plant and equipment between infringing and noninfringing business, on basis of factory overhead rather than on basis of relative sales of infringing and noninfringing products, *held* not improper.

**7. Patents ⟲318(3)—Deduction of part of interest to be credited to accounting infringer, during years when net worth of company was less than value of plant and equipment, held proper.**

In suit for accounting of profits on patent infringing business, it was not improper for master, in computing interest to be credited to defendant, to deduct interest on amounts by which net worth of company was less than value of plant and equipment during years when such condition existed.

**8. Patents ⟲318(4)—Recovery of all of profits on patent infringing business held improperly allowed.**

In action for accounting of profits on patent infringing business, consisting of manufacture and sale of complete concrete mixers, drums only of which were covered by plaintiffs' patents, where it was impossible from defendant's books to apportion profits between drum and remainder of mixer, it was, nevertheless, improper to permit plaintiffs to recover all of profits on entire mixer business, where it was evident that at least a definite proportion of such profits must have resulted from use of patented device owned by defendants.

**9. Patents ⟲318(4) — Extent to which rule permitting recovery of all of profits from infringing and noninfringing business will be enforced stated.**

Rule permitting owner of patent to recover all of profits made by infringer on infringing and noninfringing business, where such profits are so confused as to be nonproportionable, will not be enforced beyond point where it is demonstrable that to go further would be to set over to patent owner profits to which infringing elements made no contribution.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by the Cropp Concrete Machinery Company and others against the Standard Scale & Supply Company and others. Decree for plaintiffs, and defendants appeal. Reversed and remanded, with directions.

Appeal from final decree awarding to plaintiffs below their profits and damages growing out of the manufacture and sale by the Standard Scale & Supply Company, defendant below, of concrete mixers, equipped with charging and discharging devices covered by plaintiffs' patents. The parties will be designated as they appeared in the trial court. For opinion of this court on the appeal from the decree on the validity of the patent and finding infringement, see 256 F. 666, 168 C. C. A. 60. Decree was entered by the District Court pursuant to mandate, and the matter referred to a master for an accounting, resulting in a report finding defendant's profits during the infringing period from 1910 to April 19, 1919, of $192,959.40, and recommending a decree in that amount, followed by a decree awarding such profits, plus $52,508.87, plaintiffs' expense for accountants as herein indicated.

George L. Wilkinson and John C. Slade, both of Chicago, Ill., for appellants.

Franklin M. Warden, of Chicago, Ill., for appellees.

Before ALSCHULER and EVANS, Circuit Judges, and LUSE, District Judge.

LUSE, District Judge (after stating the facts as above). [1] 1. Defendant's first attack is on the allowance to plaintiffs of the amount incurred by plaintiffs for the services and expenses of accountants in the sum of $52,508.87. In the proceedings before the master, defendant was ordered to file its account under rule No. 63, the order being agreed upon by counsel as to its form, and in response filed an account in debit and credit form, which fell short of giving the information called for in the order. Thereupon plaintiffs applied to the master for an order directing defendant to produce before him its books, papers, records, etc., necessary to the preparation of an account such as had been previously ordered, and for the appointment of an accountant to prepare a proper account at defendant's expense. The result was an order for an additional account, which again failed to give the information called for. However, when plaintiffs' motion was called up, the master declined to require defendant to furnish additional information, but directed that plaintiffs or their accountants have access to the books of defendants. Plaintiffs had previously engaged accountants at stipulated per diem rates to perform their accounting work on the case. The accountants spent a great deal of time in doing the work and testifying. Their report was the basis for the master's award as to profits and in his report this appears:

"The statement and additional statement were unsatisfactory and of little use to the plaintiffs or to the master in arriving at gains

and profits, and plaintiffs put their accountants, Mitchell, Castenholz & Co., on defendant's books. They spent over a year in their work, and made up a statement of account in considerable detail, showing a net profit of $276,827.71 on the mixer business. * * * The books of the accountants show that the time charges for services up to and including June 3, 1921, amount to $48,510.92 and the out of pocket expenses to $3,997.95, a total of $52,508.87, and these amounts have been billed to plaintiff. A portion of the charge for services covers time spent in attendance and testifying before the master." .

It appears also in the record that, early in the services of plaintiffs' accountants on the books of the defendant, the defendant's officers had discovered that a number of errors had been made in the accounts filed by them, but the discovery was not reported to the master, nor to any one else so far as this record shows, except a subordinate accountant in the employ of plaintiffs' accounting firm, and only came out on the hearing before the master, at which time it was conceded by defendant that the account was inaccurate and should have shown a profit of $78,096.79, while the original and supplemental statements showed a profit of but $28,051 72, of which but a small portion was, as defendant claimed in such statements, attributable to the patented features.

The master refused to recommend recovery by plaintiffs of the sum of $52,508.87 incurred by plaintiffs as indicated. The trial court decreed that plaintiff recover the profits found by the master, and in addition the $52,508.87 mentioned; the provision of the decree relating thereto reading as follows: "Plaintiffs' second exception to said report is sustained; wherefore, in addition to the award made by the master in the said report, plaintiffs shall recover from the defendants the sum of $52,508.87, found by the master, . on pages 6, 7, and 8 of the master's report, to be the cost to plaintiffs of curing defendants' default in complying with the master's orders for an account under equity rule 63 and of making the account upon which the master's report is based."

It may be conceded at the outset that the imposition of this sum may not be justified as an item of costs in the ordinary sense. McIntosh v. Ward, 159 F. 66, 86 C. C. A. 256. Nor was it imposed as such. It may be further conceded that its allowance may not be justified as a discretionary increase of damages within R. S. § 4921 (Comp. St. § 9467). There are authorities to the effect that such increase can only be imposed when

the original assessment contains an item of damages as distinguished from profits. Covert v. Sargent (C. C.) 42 F. 298; National Folding Box Co. v. Robertson (C. C.) 125 F. 524; Wooster v. Trowbridge (C. C.) 115 F. 722; Root v. Railway, 105 U. S. 189, 26 L. Ed. 975. The decree here covered profits only. But it is sufficient for the purposes of this case to say that the decree below does not purport to lay this item upon defendant as an increase in damages. As above indicated, it is assessed against it as "the cost to plaintiff of curing defendant's default."

The proceedings before the master were had before the opinion of this court in Computing Scale Co. v. Toledo Scale Co., 279 F. 648, was handed down, and without the benefit of the observations made therein. It is there indicated that, where an infringer states his profits from his records kept as therein indicated they should be kept, the plaintiff "should be compelled to accept the statement as the measure of the money decree, unless he is prepared forthwith to allege and prove either (1) that the account was falsely stated, or (2) that the profits, if truly stated, are not an adequate measure of the complainant's damages. If the first ground is sustained, the chancellor, either directly or through the master, might well appoint and qualify a competent and disinterested accountant to cure the defendant's default, and the report of the accountant should stand, unless promptly impeached for fraud or gross inaccuracy."

But little difference, if any, in regard to the subject now under discussion, exists between such a situation, where an account is correct in form, but false in substance, and one, as here, which is not only false in substance, but unresponsive in form and substance to the order of the master, entered pursuant to rule 63. In either event the practice thus outlined in the Computing Scale Case contemplates that the existence or nonexistence of a default shall be promptly determined, and the proceedings thereafter proceed in the light of such determination. If default be so established, the chancellor, either personally or through the master, may, in the exercise of sound discretion, require that the default be cured, and may appoint an accountant as indicated in the Computing Scale Company Case. In such case we know of no principle, legal or equitable, which would prevent the expense of the service of such accountant from being imposed upon the accounting infringer; he being the cause of such expenses and having been duly adjudged to be so. This was done by the Cir-

cuit. Court of Appeals for the Eighth Circuit in Flat Slab Patents Co. v. Turner, 285 F. 257.

Although the master did not, in the instant case, appoint an accountant, plaintiffs applied for such appointment, and the facts were such, we think, that the application ought to have been granted. Instead, the master ordered that plaintiffs' accountants have access to defendant's books and accounts for the purpose of ascertaining profits. Does this departure from the approved practice, under which, as we have seen, accounting expense might well be imposed upon defendant, prevent its imposition? We think not. The master issued an order under rule 63, which was agreed upon by counsel for defendant. Thus its validity and the validity of its requirements as to form and contents of the accounting statement are established, and the order is to be viewed as one issued by a court of equity with authority, which defendant was under duty to obey, and which the court had all the usual powers of a court of equity to enforce. That includes, in cases where, as here, there is persistent failure to comply, power to call on others to supply performance, and to require the recalcitrant party to pay the expense thereof. Equity Rule No. 8. The better and safer practice is to appoint a disinterested accountant as above indicated; but the power, as such, includes the power, to be exercised within the bounds of a sound discretion and with caution, to permit the adversary to supply performance at the expense of the disobedient party. That, as we view it, was what was done in this suit, and under its facts we perceive no error in it, save in those respects to which attention will now be directed.

[2] The sum allowed included the amounts earned by the accountants under their contract with plaintiffs at the stipulated per diem rate while testifying before the master. The decree also allowed costs. Herein necessarily lies a duplication of compensation to plaintiffs—comparatively small in amount, perhaps, but a duplication nevertheless, viewing the imposition as a compensatory one only. Furthermore, full compliance with the master's order did not require the furnishing of testimony in support of the account. Hence plaintiffs are not entitled to compensation beyond taxable witness fees, already allowed, for the services of the accountants as witnesses. We assume, without deciding, that, had the imposition in question been laid upon defendant by way of punishment, an excess over a strictly compensatory sum could not be successfully criticized. But the imposition was not laid in contempt proceedings, and the decree below imposes this item as "the cost to plaintiffs of curing defendant's default." The sum allowed exceeds that, in so far as it includes compensation of the accountants while acting as witnesses before the master.

[3] Furthermore, no evidence was received, nor determination made below, as to the reasonableness of the accountants' charges for their services. We are not to be understood as intimating anything on that particular point, but we think that, where allowances such as this are made, the exercise of that caution indicated above suggests the necessity of limiting such recovery to reasonable expense within the limits of the actual expenditures, rather than unquestioned acceptance of contract provisions which may or may not have been providently agreed upon. The state of the record does not permit correction of this item in this court, and requires further proceedings in the trial court.

[4] Defendant contends that in fixing the profits the court below and master erred in computing the allowance to defendant of the item of interest on its investment in its plant and equipment, in that an appraised value as of 1915 was used as the basis, instead of defendant's actual investment in such assets as shown by its books. The contention is that interest should have been computed on the actual costs of those assets, less depreciation from wear and tear. It appears that the plant was built in 1903, and was used for the manufacture of scales until 1910, when manufacture of concrete mixers was commenced and carried on with the scale business. The evidence is sufficient to warrant the finding made that depreciation as shown on the books of the company was variable, based on no logical theory, and largely arbitrary. In 1915, as a preliminary to a bond issue, an appraisal was made of the plant and equipment by a concern which made such work its business. This appraisal was based on reproduction values, new, in 1915, and was adjusted by the master to a 1910 basis, and the value of these fixed assets was determined by him for each year of the accounting period, based on such adjusted appraisal, with depreciation and additions, and interest was allowed defendant on such value.

[5] Whether or not an allowance of a reasonable rate of interest upon the value of a plant and equipment, together with current assets, is the equivalent of an allowance of "interest on the investment," may perhaps be open to question as a matter of accountancy. Often the amount of investment and value of

investment do not coincide. Similarly there may be doubt, from the same viewpoint, whether interest on investment is strictly to be viewed as an item of cost, or an element of profit. But it is well settled that an accounting infringer is entitled to deduct as an element of cost what has sometimes been termed "interest on investment," and which was said by Judge Baker in the opinion of this court in Computing Scale Co. v. Toledo Scale Co., supra, to be "really the value of the use of defendant's manufacturing plant and selling facilities." We perceive no valid reason in this case for departing from that definition. Manifestly the decree here, so far as the element now under consideration is concerned, is a proper application of the theory above quoted. The value of the use of anything depends upon its value at the time of use, and we are unconvinced that there was any error in determining this element of allowance in the manner indicated.

To defendant's contention that there was no competent evidence before the court to support the appraised value used, it is sufficient to say that at least one witness testified that he considered the valuation set by the appraisal company as excessive. Use of an excessive valuation for the purpose of allowing the value of the use in reduction of defendant's profits is clearly unprejudicial to it.

[6] Error is urged on the ground that, in allocating the interest on defendant's investment in the plant and equipment between the infringing and noninfringing business, such allocation was on the basis of factory overhead rather than on the basis of relative sales of the infringing and noninfringing products of the factory. As bearing on this phase of the case, we must advert to some of the facts. Ordinarily the concrete mixing drums were sold with accessories and equipment, such as gasoline engines, by the power of which the drums were rotated. Other accessories were also sold as usual equipment for the complete mixers, and they were in the main, and as to gasoline engines in their entirety, purchased by the defendant in the market, and were the subject of no manufacturing operations in the plant. Nevertheless such accessories formed a large element in the cost of the mixers and in their selling price. Total sales in dollars and cents of the mixers so equipped, when compared with total sales of scales also manufactured by defendant, and total sales of other merchandise dealt in by it, would, as a result, necessarily indicate little as to the comparative use of the plant and equipment in producing concrete mixers and scales, respectively. While it is true

that there were some sales made of mixed drums separately, and some on a framework called "skids," it was nevertheless determined on sufficient evidence that such sales were not typical, but were rather special, special prices prevailed, and that they were not a safe guide as to the sale price of drums, when sold, as they usually were, with full equipment. The testimony of one of defendant's own accountants indicates that he did not wholly approve of prorating interest on investment on the basis of the relative volume of sales as between mixers, scales, and merchandise in this case, and he admitted that the relative investment properly attributable to the mixer and scale business respectively might well be determined on the basis of use.

The method used by the master, and approved by the trial court, is stated by the former as follows: "In arriving at the amount of interest on investment chargeable to mixers, interest on the value of the plant and equipment, which was used by mixers and scales only, has been divided on the basis of factory overhead, and interest on the current assets has been divided on the basis of sales of mixers, scales and merchandise." The master found that the total factory overhead was $913,391.09 for the entire accounting period, and that of that amount $179,901.86, or 19.6 per cent., was properly chargeable to mixers. He therefore credited defendant with 19.6 per cent. of the total interest on the value, reckoned annually, of the plant and equipment.

In order that a clear understanding may be had of the method used by the master in determining and allocating overhead, the following is quoted from his report:

"Another manufacturing cost is factory overhead, including indirect labor, superintendence, insurance, taxes, light, heat, and power, maintenance and repairs, depreciation, etc., not directly applicable as a cost of manufacturing any specific article. These items have been taken from defendant's books.

"Overhead items are divided into two classes: First, those that may be charged directly to a department, such as foreman's wages; second, those that are general in their nature and apply to all departments, such as light, heat, and power. The basis adopted for dividing overhead in this case is the direct labor wage basis. Under this method the overhead items of a general nature are apportioned to the different departments of the factory by taking a per cent. of the direct labor in each department equal to

the per cent. that the total general overhead bears to the total direct labor. The overhead so apportioned to a department is added to the overhead items directly charged to the department, and this total is divided between the articles worked on in that department on the same direct labor wage basis.

"The direct labor wage theory of arriving at overhead, where different and dissimilar products are manufactured in the same plant, and where the books have not been so kept that the machine hours can be ascertained and used as a basis, is generally regarded by accountants as the best method of arriving at overhead, and while there are other methods that may sometimes be used, the direct labor wage method has been accepted as the most reliable method to be used in this case."

Further elucidation of the method used will be found in Table F of the master's report, which is printed below. Table F shows the calculation of interest on investment:

same, or approximately so, as the percentage which direct labor wage on mixers bore to the total direct labor wage. Thus understood, and having in mind the allocation of overhead, also considering those overhead charges directly chargeable to the mixer business, there is no doubt but that the relation between the overhead found applicable to the manufacture of mixers and the same elements found applicable to the manufacture of scales is indicative of the extent of the use of the plant and equipment for the respective products. That it accurately measures such use may be the subject of some doubt, but we see no reason to dissent from the proposition that it is a more accurate measure, under the facts of this case, than either apportionment on the basis of sales or prime cost would be, and is as nearly correct as the facts permit.

[7] The master deducted, from the interest credited to defendant on current assets,

Table F.

| *** | Net Worth. | Plant and Equipment at Appraisal. | Interest at 5%. | Difference Between Net Worth and Plant and Equipment. | Interest at 5%. |
|---|---|---|---|---|---|
| 1910 | $229,253.22 | $287,189.55 | $ 12,923.50 | —$57,936.33 | —$2,896.81 |
| 1911 | 225,056.80 | 287,189.55 | 14,359.47 | — 62,132.75 | — 3,106.63 |
| 1912 | 218,151.44 | 287,189.55 | 14,359.47 | — 69,038.11 | — 3,451.90 |
| 1913 | 265,686.96 | 287,189.55 | 14,359.47 | — 21,502.59 | — 1,075.12 |
| 1914 | 321,296.54 | 290,683.36 | 14,534.16 | 30,613.18 | 1,530.65 |
| 1915 | 549,779.86 | 326,233.73 | 16,311.68 | 223,546.13 | 11,177.30 |
| 1916 | 565,634.04 | 374,538.21 | 18,726.91 | 191,095.83 | 9,554.79 |
| 1917 | 578,408.52 | 346,188.21 | 17,309.41 | 232,220.31 | 11,611.01 |
| 1918 | 718,304.64 | 428,994.99 | 21,449.75 | 289,309.65 | 14,465.48 |
| 1919 | 799,583.50 | 485,798.28 | 7,352.48 | 313,785.00 | 4,750.31 |
| | | | $151,686.30 | | $42,559.08 |

On the basis of factory overhead, 19.6 per cent. of $151,686.30 interest on investment in plant and equipment is chargeable to mixers........... $29,730.51
On the basis of sales, 26.31 per cent. of $42,559.08, interest on current assets, is chargeable to mixers.......................................... 11,197.29

Total interest on investment chargeable to mixers................. $40,927.80

Consideration of this method, with some illustrative computations, discloses that under it (laying aside for the moment consideration of overhead charges directly chargeable to a department) the percentage which the overhead chargeable to a given product bears to the total factory overhead reflects with accuracy the percentage which direct labor wage upon such product bears to the total labor wage. In other words, the master apportioned the interest on the value of the plant and equipment by crediting defendant with a percentage of such interest, equal to the percentage which the overhead properly attributable to mixers bore to the entire overhead, which latter percentage is in turn the

interest on the amounts by which and for the years in which the net worth of the company was less than the value of the plant and equipment. Reference to Table F of the master's report, supra, will disclose the method of computation. Defendant contends that this was error. In considering this question, however, it must be borne in mind that what was being attempted was the determination of the proper amount of interest which would represent the value of the use of defendant's plant, equipment, and selling facilities for the entire infringing period. Interest was allowed for the years 1910 to 1913, inclusive, on the full value of the plant and equipment, while the net worth of de-

fendant's plant, equipment, and current assets was less than that. Certainly an adjustment of such allowance on some basis was proper, and no want of equity is seen in making the adjustment in the manner pursued by the master and allowed by the court below.

[8] Error is assigned because plaintiffs were awarded the profits on the entire mixer business (except as to noninfringing parts sales). It appears that a complete concrete mixer consists of the drum and gears, which are denominated the main parts, and auxiliary parts, which includes rollers, bearing boxes, shafting, chutes, and motive power, such as gas engines and battery boxes or steam engines and boilers, truck frames, wagons or skids, etc. During the accounting period 4,173 drums were sold. Of these 169 were without accessories, 227 were on skids without power, and 3,777 were sold as complete outfits, consisting of the drum, engine, truck, or varying auxiliary devices. In addition, there were certain so-called parts sales, being sales of parts of the drum or equipment that went with the drum, some of which were infringing and some of which were noninfringing parts.

The following excerpt from the master's report indicates the disposition of this question below and assigns reasons therefor:

"Efforts have been made to ascertain how much of the selling price of a complete mixer outfit is attributable to the drum, and how much to the accessories, with a view to determine the profits made on drums alone; but as the outfits were sold for a lump sum, without any effort at the time to separate the selling price between the different parts, it is impossible now to determine how much of the selling price is attributable to the separate parts. If the 169 drums sold without accessories were typical, a unit profit figure might be obtained and applied to drums sold with accessories. These drums were but a few of the many sold. They were not typical, were sold on special orders and as repair parts, and it was conceded that a unit profit figure obtained on these drums could not safely be applied to drums sold with accessories.

"Efforts were also made to arrive at a unit profit figure on the 227 drums sold on skids, with a view to applying this unit figure to all the drums. Such sales were special, and cannot be relied upon to furnish a unit profit figure, and a figure so produced shows greater profits than are shown upon the entire mixer business. It has therefore been necessary to award to the plaintiffs the profits on the entire mixer business, except as to the noninfringing parts sales, and it is believed that in so doing the ends of justice will be served, as it is apparent that all of the profits on mixer outfits were due to the drum."

That the defendant's records disclosed no assignment of any part of the selling price of a complete mixing outfit to the parts patented and unpatented is undisputed. Plaintiffs offered testimony in support of the theory that the patented low charge and the discharging mechanism were elements which contributed largely to the demand for defendant's product, and that from the sales of drums alone, or drums on skids, a unit profit figure upon drums only could be ascertained. As indicated in the master's report, that method of apportionment was rejected; such sales being special, for an enhanced price, and resulting in a showing of greater profits than resulted from the entire mixer business. That rejection, under the circumstances, is approved.

Defendant contends that profits should be apportioned first between the drum and the rest of the mixer, and that the resulting apportioned profits should again be apportioned between the infringing charge and discharge mechanism, and the noninfringing parts of the drum, on the prime cost theory, to wit, by apportioning to the patented features such part of the entire profits as the prime cost of the patented elements bears to the prime cost of the entire outfit sold. This, counsel are agreed, would result in apportioning about 16 per cent. of the profits to the drums and about 84 per cent. to the balance of the mixing outfits. This method was also rejected by the master and trial court, and we think properly. It is true this method has been and properly may be used in many cases, but necessarily assumes an equal margin of profit upon each dollar invested, whether in the infringing parts or the noninfringing parts, and relegates all parts to a position of equality of importance in the assembled product. It is therefore somewhat artificial and arbitrary, but nevertheless often justified, though the result is only approximately correct, and not mathematically exact.

But here defendant manufactured the drum with its infringing features, while in large part it purchased the other parts of the complete mixers, including the motive power. It is fair to presume, we think, that its profit as a manufacturer was greater than its profit as a mere merchandiser. Furthermore, while recognizing the practice of man-

ufacturers to demand disproportionate prices for parts separately sold, it is significant that in this case, when drums were separately sold, or sold with a minimum of accessories, the profits realized were on the average equal to those realized on an entire outfit. Under such circumstances it is apparent that there ought to be allocated to the drums a larger share of profits than the prime cost method permits. The rejection of both methods of apportionment advocated by the parties is therefore approved.

The finding below that "all of the profits on mixer outfits were due to the drum," however, we think assigns to the infringing elements too much of importance. That the period involved was one of rapid development and great activity in the trade, and buyers of mixers probably not extremely critical; that there were numerous competitors apparently conducting business successfully in marketing mixing machines which did not have the particular charging and discharging features of the patent; that the defendant continued to sell mixers with apparent success after abandoning the infringing structures; that the defendant equipped its product with a semiautomatic device for facilitating the discharge, patented by Mr. Reed, patent No. 939,629, which no doubt contributed to defendant's profits, together with consideration of the fact that the patented features contributed not so much toward the effective mixing of the materials as the convenient, prompt, and economical handling of the material into and out of the mixer—all serve to satisfy us that it is an exaggeration of the importance of these infringing elements to ascribe all of the profits to their use.

The only methods of apportionment offered by the parties being so rejected, and the attribution of all profits to the plaintiffs' patented devices having likewise been rejected, the decree below can only be sustained, with respect to its phase now under consideration, if the plaintiffs have met the burden placed upon them of establishing impossibility of approximate apportionment of profits, within the rule enunciated in Westinghouse v. Wagner Mfg. Co., 225 U. S. 620, 32 S. Ct. 691, 56 L. Ed. 1222, 41 L. R. A. (N. S.) 653.

It is not deemed necessary to recite the evidence bearing upon this point, further than to say that it is disclosed that the infringing elements of defendant's machine made a substantial contribution to their profits, sufficiently substantial so that neither the test of apportionment on the prime cost the-

ory nor, assuming that the evidence permitted it, on the basis of manufacturers' profit as to drums and merchandisers' profits as to the engines and other parts purchased by defendant, would approximately reflect such contribution. What the defendant's books and records disclosed, and what they failed to disclose, all tend to show that no method of apportionment of profits on the infringing parts from those on the noninfringing parts of the machine in fact exists. There is evidence, also, by one of the defendant's expert witnesses, who testified in support of the prime cost method of apportionment, to the effect that no other proper method existed. We think, therefore, that it may fairly be said that the profits cannot properly be divided, in the ordinary sense, between the infringing elements on the one hand and the noninfringing elements, including the motive power and other accessories, on the other.

But, it must be borne in mind that an award of all the profits to infringing elements, which in fact do not create them all, is a method which equity adopts as of necessity, to place, as best it may, the burden resulting from commingling and confusion where it rightfully belongs, to wit, on him who has brought it about. Nevertheless the rule under consideration is a rule of equity, and, being so, it is not to be applied beyond the point required to bring about the result sought. It "is not intended to penalize the infringer, nor to give the patentee profits to which he is clearly not entitled." Westinghouse Case, supra.

As said in Tilghman v. Proctor, 125 U. S. 136–145, 8 S. Ct. 894, 899 (31 L. Ed. 664), "It is inconsistent with the ordinary principles and practice of courts of chancery, either, on the one hand, to permit the wrongdoer to profit by his own wrong, or, on the other hand, to make no allowance for the cost and expense of conducting his business, or to undertake to punish him by obliging him to pay more than a fair compensation to the person wronged." Furthermore, it is well settled that apportionment need not be made with mathematical accuracy, "but only reasonable approximation" is required. Dowagiac Mfg. Co. v. Minnesota Plow Co., 235 U. S. 647, 35 S. Ct. 221, 59 L. Ed. 398.

[9] Application of these principles renders it apparent that in case of partial commingling or confusion of profits an award to plaintiffs should extend no further than the actual commingling requires or permits. In other words, even though confusion of profits exists, whenever the court reaches a point or sum where it is demonstrable that to go be-

yond that point or exceed that sum is to set over to plaintiff profits to which the infringing elements make no contribution, that point or sum is the proper place to stop in enforcing the rule.

With these observations before us, it is clear that all profits of the defendant which can with reasonable accuracy be attributed to noninfringing parts are to be deducted, before the rule which attends confusion of profit is applied. To illustrate: Let it be assumed that, in carrying on its business, a definite profit was fairly and honestly earned by defendant on the Reed semiautomatic discharging device, when it was sold as a part of the mixer, and that such profit was consistently carried out, charged, collected, appeared on the books, and was so handled that a finding was required that upon the sale of each mixer a certain sum was collected for, of which a certain amount was profit on, that particular device. Let us assume further that, as here, there was complete confusion of profits as between all the remaining parts of the machine, infringing and noninfringing. In such case it is quite clear that the award of profits ought not to include the profits upon the semiautomatic discharging device. In the instant case, it must at once be conceded that, as the defendant's business was conducted, it is no more possible to determine in dollars and cents the profits made on the Reed device than on the "infringing charge" and "discharge." Nevertheless, careful consideration has convinced us that, even though there may be a difference in the cost of these devices, the three of them, closely allied, in the function of forwarding the efficient handling of material into and out of the mixer as they are, contributed about equally to the efficiency of the machine, and that the Reed device contributed to these profits substantially the same as each of the infringing elements.

We have therefore an unknown and unascertainable part of defendant's entire profits attributable to the three devices equally—one-third to each. Because the amount in dollars and cents of the contribution to the profits by these three devices is unknown and unascertainable, we are unable to make the apportionment in the ordinary sense, by allocating to each a certain sum; but because their proportionate contributions are known —in this case equal—it demonstrably follows that the actual contribution of the two infringing elements does not and cannot exceed two-thirds of the entire profits of the period ending March 17, 1917, at which date defendant ceased to use the infringing dis-

charge, nor exceed one-half of the profits for the period from March 17, 1917, to the end of the infringing period on March 19, 1919. In fact, as we find the contribution to profits by each of the three devices to have been equal, it follows that an award to plaintiffs of two-thirds of all the profits prior to March 17, 1917, and one-half thereof after that date, will secure to plaintiffs all they are equitably entitled to, give them all the profits up to the point beyond which it is demonstrable there is no confusion of profits properly belonging to them with those of defendant, while limiting the recovery against defendant to such profits as cannot be apportioned, due to its own acts of commingling. The master made no findings separating the profits before and after March 17, 1917, and hence further proceedings below in accord with this opinion will be required.

The decree below is reversed, and the suit remanded, with directions to strike out the item of $52,508.87, and to insert in lieu thereof such sum as the court shall award in accord with the views expressed in this opinion with respect to allowance of accountants' expense, and to assign the ascertained profits to the two periods, before as well as after March 17, 1917, and to award to plaintiffs two-thirds of those earned prior, and one-half of those earned subsequent to, that date. Appellant will recover costs in this court.