## ELLETT et al. v. KLEIN et al.

District Court, E. D. Pennsylvania. November 10, 1927.

No. 1321.

1. **Patents** ⊜⟳260—**Refraining from confiscating whole value of device does not preclude infringement.**

Infringement cannot be escaped through the expedient of refraining from confiscation of the whole value of the patented device.

2. **Patents** ⊜⟳226—**Features of prior art, differentiation from which constitutes the invention of a patent, cannot be claimed as equivalents to establish infringement.**

A patentee, who obtains his patent and upholds its validity on the strength of a differentiation of elements from features of the prior art, cannot be heard, in an accounting proceeding on a claim to recover profits or damages, on the theory that these before differentiated features are equivalents nor can equivalency be found in a mere community of results.

**3. Patents ⬅318(3)—Average profits, made on few sales of infringing device alone, held not a fair measure of profits from sales as element of a machine.**

Where sales of machines embodying an infringing device amounted to millions of dollars, and 337 sales were made of the device alone, the average profit made on such few sales *held* not a fair measure of that made from the sales as part of the machine.

**4. Patents ⬅318(3)—For accounting purposes ratio of profit made on small infringing element held fairly to ˌbe taken as same as in entire machine.**

Where defendant manufactured and sold motorcycles embodying a clutch in infringement of complainant's patent, the ratio of profit made on the clutch, for purposes of accounting, are the same as on the entire machine.

**5. Patents ⬅226—Selling infringing device in parts does not prevent infringement.**

In suit for infringement, defendant could not escape accountability by selling the infringing device in parts.

**6. Patents ⬅318(1)—Infringer is accountable for profits by sale of repairs for infringing article.**

Since an infringer has no more right to use the property of the patentee to make repairs to an infringing device than he has to make the infringing device originally, he is accountable for profits made by sale of repairs for the infringing article.

**7. Patents ⬅318(6)—Profits tax paid by infringer could not be considered in reduction of liability, though including profits on infringing article.**

In suit for infringement of patent for motorcycle clutches, where defendant had paid a profits tax, such tax, though including profits on the infringing article, could not be considered in reduction of his liability to the owner of the patent.

**8. Patents ⬅318(6)—Interest on invested capital of infringer could not be considered on accounting for profits.**

In suit for infringement, interest paid on invested capital of infringer was not an item to be considered on an accounting for profits.

In Equity. Suit by Frederick S. Ellett and the Eclipse Machine Company against Alexander Klein and the Harley-Davidson Motor Company. On exceptions to report of master on accounting. Sustained in part. See, also, 252 F. 805.

Archibald Cox and Robert W. Byerly, both of New York City, for plaintiffs.

C. N. Anderson, of Philadelphia, Pa., Frederick P. Fish, of Boston, Mass., Henry M. Huxley, of Chicago, Ill., and Wm. S. Hodges, of Washington, D. C., for defendants.

DICKINSON, District Judge. This cause concerns letters patent No. 1,018,890 and No. 1,071,922, issued to Frederick S. Ellett, for motorcycle clutches. The conclusions reached are found in the answers to a list of questions into which counsel have condensed the discussion.

### Discussion.

Claims 1, 8, 11, and 12 of the one patent and claim 1 of the other were held to be valid and infringed by the Circuit Court of Appeals for the Third Circuit in an opinion by Woolley, Circuit Judge, reported in 252 F. 805. Following the mandate accompanying the ruling, this court entered a decree (inter alia) awarding profits and damages, and referred the cause to a master to state the usual account. The report of the master has been filed and is before us on exceptions, some filed by the plaintiffs and others by the defendants. The questions now remaining in the cause have, as has been stated, been formulated and listed by counsel for our convenience and for clarity of discussion. After answers to these are made, a final decree in form will be submitted by counsel, or, if they do not agree, will be framed by the court. This will cause something of a departure from the usual course of a discussion of the specific exceptions to the report of the master. This report discloses on its face and throughout the record of the proceedings before him the most painstaking and attentive consideration given by him to the cause in all its features, and it is to the fullness and completeness, as well as the clarity, of his treatment of all the questions which arose before him that we are indebted for the short cut opened to us. This ˉlist is ρf some length, and each question provides in itself the text of a more or less necessarily protracted argument. Before directing our attention to these listed questions, it may be premised that there are two general primary questions which arise, the answer to each of which supplies the answer to one or more of the listed questions.

### Primary Questions.

The first of these primary questions may be thus formulated: For the manufacture and sale of what clutches must defendant's account? Here, again, we are favored by the fact that each of the parties is represented by counsel of experience, who have again listed the several clutches made by the defendants, and so far as possible have agreed upon the salient facts bearing upon the questions to be ruled.

### The Clutches Classified.

This accord has taken the form of dividing all the clutches into five classes, desig-

nated as G, H, 1914, 1915, and 1919. Of these, class G is made up of the specific make of clutch which was before the Circuit Court of Appeals, and classes H, 1914, and 1915 of clutches which admittedly come within the ruling then made. It is agreed that for the clutches of these four classes the defendants must account.

## Clutch 19.

The remaining class, made up of the type of clutch known to this discussion as clutch 19, bears the brunt of the arguments pro and con of whether this clutch is that found by the Circuit Court of Appeals to be an infringement. This takes us to the ruling made by that court. For this reason and also because it has taken the form of being also the decree of this court, it is admittedly the law of this case. We confess to a feeling of no little embarrassment in discussing it. As, however, we have been commanded to do so, we do it as if it were a case cited for our guidance to lead us to the determination of another case.

The defendants were manufacturing and selling motorcycles before Ellett patents were issued. The ruling made does not imply a denial of their right to continue to make and sell motorcycles; it is a denial only of their right to use, make, or sell the clutch found to be that of the patent. We are in full accord with counsel for defendants that, if in the prior art or out of their own devising they could find in the patent law sense another clutch than that found to be an infringement, they are free to use, make, or sell it. This is what the defendants confidently and emphatically assert they have done.

We are in like accord (as also are the defendants) with counsel for plaintiffs that the opinion before mentioned determines for us what the clutch of the patent is, and provides us with our sole guide in seeking an answer to the question of whether clutch 19 is the clutch of the patent in the patent law sense. The plaintiffs assert that it is with a confidence and emphasis equal to that of the defendants. The issue is thus clear-cut, and so far there is accord.

## The Clutch of the Patent.

What, then, is the clutch of the patent? The language of every opinion must be read, if it is to be properly interpreted, in the light of the fact situation and subject-matter to which it relates. There is to be read into it the evidence in the cause, and as this included the prior art (so far as then in evidence), we may have recourse to this in the interpretation of the opinion. The argument of the opinion (after a short exordium) opens with the finding that before Ellett there were no clutches. Compensating sprockets and idlers had been resorted to as expedients to relieve the shock of a direct power transmission. Unsuccessful attempts had been likewise made to introduce the use of clutches. Ellett solved the problem by passing "the arbitrary mechanical control of the motor to the instinctive control of the rider." After Ellett, "every motorcycle now [i. e., at the time of the opinion] * * * has a clutch embodying" the Ellett patented invention. This, as we read the opinion, credits Ellett with the merit of a pioneer in the introduction of practically effective motor clutch engine control.

The argument then proceeds to an analysis of the invention, which is found to consist "fundamentally of three elements" in combination. To no one of these elements is inventive creation ascribed to Ellett. Invention is ascribed wholly to his combination. These elements, with their combination, are then described. It is recognized that in the motorcycle problem economy of space is called for. This is met by the mode of mounting one rotary member upon the other. The choice of the kind of disc employed is next noted, the only credit given to Ellett being that of the selection of the type which thereafter became the type used by all makers of motorcycles "to the exclusion of all other types."

The next element discussed is "the screw or screw cam" which serves the purpose of an actuator. This "simple as it is" was thereafter put in use by every manufacturer. The statement is added that "there seems to be no substitute for it." We may interpolate here that this sentence has served as the text for somewhat lengthy sermons. The defendants aver that this was the very thing they found among the possessions of the old art in the form of a face cam. The plaintiffs commend it as an accurate statement of the then existing art and as a thus far vindicated prophecy. We do not attach to the quoted phrase the important place which seems to have been given to it in the discussion. We do not think it was meant to be a finding of the limits of the capacity of those skilled in the art, and are sure it was not a prophecy of what would or would not come to pass. We see nothing in it more than an emphatic commendation of what Ellett had done. The "utility of a clutch combining these three correlated parts," and in what it consists is then found, and finally the merit of invention

within the meaning of the patent laws is awarded to Ellett.

The question then becomes whether clutch 19 is the clutch thus found to be the clutch of the patent or something different. Whether it is or not would seem to be essentially a question of fact. It is an inferred, or what is called an ultimate, fact, and, being thus a matter of inference, partakes of a conclusion, and in a sense of a conclusion of law; but it is none the less a fact finding, in the sense that there is found to be in clutch 19 the same elements which are in the clutch of the patent. The fact finding has been made by the master that the elements of the patented clutch are all found in the 19 clutch, and the patented combination is also present.

The questions to which we are to find answers are so many that there is no room for a discussion of these fact features. We are in consequence content to accept these findings, and to leave the vindication of their soundness to the report of the master and the very capable hands of counsel. With these fact findings made, the legal conclusion follows that clutch 19 is the clutch of the patent, for sales of which an accounting should be made. The finding is, of course, not one of identity. The master has, however, invoked the rule that one who departs in some respect and to some extent from a patent, even at the cost of a surrender of some of its benefits, retaining the others, does not thereby escape conviction of infringement.

This doctrine of the law is not controverted by counsel for defendants, but its application to the fact situation here presented is. Its application resides in this circumstance. One of the elements of the patented clutch, it will be recalled, is the screw cam actuator. This features in the combination as a helix. One utility of this is the extent of bearing and wearing surface thereby provided. This figures in the discussion as a 100 per cent. face. Defendants stand up strongly for the fact that the cam of clutch 19 is the face cam of the old art, the sole differing feature of which is the number of the divisional sections. The master finds it to be a screw cam mutilated. If the cam of clutch 19 be the face cam of the prior art, we can easily follow the argument of defendants' counsel to its conclusion, because we entertain no doubt that the nicety of adjustment afforded by this screw feature of the patented clutch was a major influence toward the finding of validity; but, if the cam of clutch 19 is helical, this fact seems to us to end the discussion.

[1; 2] Infringement cannot be escaped through the expedient of refraining from a confiscation of the whole value of the invented device. Of course, however, it is true that a patentee, who obtains his patent and upholds validity on the strength of a differentiation of elements from features of the prior art, cannot be heard in an accounting proceeding on a claim to recover profits or damages on the theory that these before differentiated features are equivalents, nor can equivalency be found in a mere community of results. On the other hand, if there is an added similitude or equivalency of the means employed to reach results which are common, infringement may be found.

We do not follow the criticism of counsel of the, as it seems to us, obviously true observation of the master that, the Circuit Court of Appeals having applied to the actuator of the patent the descriptive appellation of screw or screw cam, the defendants could not escape conviction of infringement in the use of the same actuator in the form of a like screw cam by merely applying to it a different name, as by calling it a face cam, or lever, or any other differing appellation.

### How the Defendants Should Account.

Having thus settled, so far as concerns this court, the question of for what the defendants should account, there remains the question of the method of accounting. Here the classification expands to a sixth, because in class 19 is included another clutch, known as the sport clutch, and there is a more numerous classification on differing bases. These, it seems to us, can, after some general observations, be best treated by finding answers to the questions into which counsel have condensed the discussion.

The decree here was for an accounting for damages and profits. Plaintiffs have definitely elected to content themselves with profits and to ignore the question of damages. The plaintiffs in every case of this general kind are really complaining of a wrong done to them. Redress, so far as a money award can afford it, is their due. This is expressed by the phrase "fair compensation." This means that they should be restored as nearly as may be to the financial state in which they would have been, had the wrong not been done. This is only a way of spelling damages, as it accurately expresses the meaning of that word. Damages belong to actions at law, and not to proceedings in equity. There were advantages, many and obvious, for trying patent cases as cases are tried in equity, rather than trying them in an action at law.

Plaintiffs, however, had the choice in their hands, so that some inducement must be giv-

en them to resort to equity. This, we assume, prompted the policy back of the provision to give profits and damages in equity as against damages only at law. There was, of course, the supporting thought that an infringer who had tortiously appropriated the property of a patentee might profit thereby far in excess of any damage suffered by the owner. Such gains were ill-gotten, and the thought of compelling the wrongdoer to disgorge is an appealing one. This could be done on the theory or purely artificial basis that he was a trustee. If so, he was a trustee ex maleficio, and subject to the rigorous rules of accounting which applied to wrongdoers. In theory, however, a fair result could be reached by the simple method of subtracting from the sale price received the production cost and calling the remainder profits.

When patented things were mousetraps or other simple sale units, this system or method of accounting suggested no objections in theory. When, however, all business came to be the highly complex thing it now is, and what was sold was a small part of what had been patented, such a method of making compensation to a patentee produced results which every one recognized to be not only unfair, but absurd, as a measure of the profit made out of the patent. In the days when the buyer had something to say in the fixing of prices, there was some relation between the commercial value of the thing sold and the price at which it sold. Under modern conditions, the price obtained is due almost wholly to the arts of salesmanship, and the merits of the thing sold have very little to do with it. For every dollar with which the buyer parts to-day, he pays 15 cents for what he gets and 85 cents to the salesman for persuading him to make the purchase. Even if the problem were as simple as the theory assumes, the ascertainment of production cost is a Dundreary accomplishment. More men have led themselves blindly into the bankruptcy court by their system of bookkeeping than any one other thing.

Any manufacturer can show a profit or no profit by the simple expedient of entering in or omitting from an improvement or other capital account expenditures which belong in expense account. The brightest minds in the business and official world have applied themselves to the task of devising a method of stating a profit and loss account without success. Indeed, there would be as many methods of figuring profits as there are figurers, except for the necessity of reaching some sort of a convention. Every one of these methods is, and necessarily must be,

purely artificial and far from reaching a true result. The proofs of this are on every hand. The proceedings of any rate or price fixing commission is a disclosure. We have examples of the utter unreliability of accounting results before us. One is that almost every day receivership and bankruptcy estates disclose claims based upon earned profits stated according to the most approved methods, when it is as sure as anything can be that insolvency was present at the very time and long before the profit on paper appeared.

Another instance is afforded by this very case. The year 1921 shows a loss of $400,000 or more. We do not know whether the record discloses, and we have not inquired, but we venture the confident assertion that this result was reached by the marking down during that year of an inventory, or some equivalent bookkeeping act.

There is still another instance afforded by the widely different accounting results among which we are asked to choose. The plaintiffs figure out that the profits really reach a total of between $8,000,000 and $9,000,000, but intimate that they would be satisfied with $3,500,000, but no less; the master has awarded them $728,653.12, and the defendants express no doubt that a proper accounting result would show the plaintiffs' share of profits to be a nominal sum. Nor are these startling contrasts surprising. The defendants were selling motorcycles. The patent relates to a clutch. There were sales likewise of parts. The art has taken up, not only with clutches, but with change gears, and the problem is thus made perplexingly complex. The attempt to reach a statement of profits is in itself hopeless, except by a conventional method, and to add to this an apportionment of profits among the patented and unpatented parts presents a problem which can be solved only by the Gordian knot method. The parties recognizing this truth have applied the sword by what, as we understand it, is the equivalent of an agreement upon the figures; so that, as soon as the principles of law voiced in the list of questions already twice referred to are ruled, a final decree can be entered.

It is high time this litigation was at an end, and we will do our part toward speeding the day of final decree, so far as concerns this court for the time being. We have already reached the length limits of a judicial opinion, so go directly to these questions, the list of which we subjoin:

(1) Should or should not the defendants' type 19 clutch be included in the accounting?

(2) Was the master correct in calculating profits on clutches sold integrally with

motorcycles by applying to such clutches (numbering 193,213) the average profit realized on 337 separately sold type 11 clutches, amounting to $4.27 per clutch, before deductions for profits taxes and interest on investment?

(3) Should or should not the master have calculated profits, by applying to infringing clutches sold integrally with motorcycles, the average profit on 6,882 clutches sold integrally with motorcycles, but billed separately, during 1912, and amounting to 25 cents per clutch with controls, and 20.4 cents per clutch without controls, before deductions for profits tax and interest on investment?

(4) Is or is not the cost ratio method, as presented by defendants, giving profits on the entire clutch of types H, 14, and 15, amounting to $70,619.05, including sales to the United States government to July 1, 1918, the proper method for accounting for profits in this case? The cost ratio method, differing in details, is presented by plaintiffs' basis VII.

(5) Should or should not the profits on 895 type 15 clutches, sold without actuators, and amounting to $2,781.05, be included in the accounting?

(6) Should or should not the recoverable profits be limited to the actuators of the infringing types 11, 14, and 15 clutches, amounting to $8,601.08?

(7) Shall or shall not either of plaintiffs' bases II or III, awarding entire or one-half of entire profits on chain-driven motorcycles, be accepted as bases for accounting for profits on clutches in this case?

(8) Should or should not profits on clutch controls be included?

(9) Should or should not profits on repair parts be included?

(10) Was the master correct in deducting profits taxes in determining recoverable profits?

(11) Was the master correct in making an allowance for interest on investment, and, if so, should this be on the average yearly net worth, or should it be restricted to the net worth at the beginning of the infringing period, and should the rate be 5 per cent. or 6 per cent.?

(12) Was the master correct in excluding profits on sales made to the United States government after July 1, 1918?

(13) Was or was not the master, holding as he did that profits on defendants' type 19 clutches are recoverable, correct in failing to deduct losses?

(14) Was or was not the master correct in denying defendants' motions to reopen?

(15) From what time should interest on recovery begin to run?

1. There should be an accounting for clutch 19. This we have already ruled.

[3] 2. The master followed the rule of accounting adopted in Mason v. Graham, 23 Wall. (90 U. S.) 261, 23 L. Ed. 86. The question is whether the master was right in so doing. The answer to this question may be expanded into an answer also to questions 3 and 4. As this is the one feature in which we are out of accord with the master, and as it is in practical consequence one of the most important questions in the cause, we feel constrained to devote some space to it and question 4.

We may clear the decks by a few general observations. The plaintiffs have the right to adequate redress for the wrong done them. The defendants have no right to retain profits received from what had been found to be the plaintiffs' clutch. The plaintiffs were given this redress by being awarded damages, and were adjudged these profits through an accounting. The profits might far exceed the damages. The plaintiffs, for very good reasons, which may easily be divined, disclaimed damages by renouncing them and are asking for profits only. This means that they are content with their share of whatever profits were in fact received by the defendants; that this share is the profit on the clutch, and that all question of damages is eliminated. With the element of damage thus out of the case, and the profits restricted to actual profits, the case comes very close to that of sales of clutches made by the defendants for the plaintiffs and on their behalf. In addition to this, we have the fact feature of agreement upon all the figures necessary to an accounting, except the legal principles upon which the accounting is to proceed.

The defendants sold a large number of clutches by selling motorcycles of which the clutch was part. They also sold (inter alia) 337 clutches separately as clutches. We have the figures of the total profits, and the cost ratio basis of apportionment between the clutch and the other parts. We have also the average profit on the clutches sold separately. The learned master, following Mason v. Graham, assumed and conclusively presumed that the profit on every clutch (of course, on the average) was the average profit on each of the 337 clutches. Courts on occasion must find profits. The effort is to get at the truth. When the actual profit is known they take that. When it is not known, they seize upon the nearest reasonable fact presumption and take that.

It is upon the same principle that the market price doctrine is accepted in fixing commercial values. If there is a market price, it is reasonable to presume that the thing in question would bring at least that much; it is not reasonable to presume that it would bring more. Hence the commercial value is fixed at the market price. The market price is accepted, because it is taken to be the consensus of everybody's judgment of what is right and what everybody thinks to be right is presumed to be so. If the quest is to learn at what price a thing was sold, and we do not know, we assume it was at the market price; but, if we know what the fact was, we take that. If there is no market, and hence no market price, we take the next best test of commercial value which is at hand. Thus every case stands pretty much on its own special facts.

In Mason v. Graham there was a considerable number of separate sales of the patented thing, enough to establish what might be called a market price, and there was enough of a market, so that the patented thing might be sold readily. At what profit the patented thing had sold with other things did not satisfactorily appear as a fact, because the apportioned profit was insignificant. The court assumed, because it might reasonably presume, that all the patented things sold had been sold at a no less profit than at the separate sales, after allowing for an improvement which the infringer had made. This could reasonably be presumed, because the infringer, having the choice to sell separately at that profit, had elected to sell along with other things. This raised a fair presumption that he did so because he could reap the same or a higher profit. Here neither the number of sales nor the conditions surrounding all the sales would justify any such inference. On the contrary, the logic of those conditions would suggest that the few sales which were made were made because prompted by an unusually large profit.

We are constrained to differ with the learned master on the applicability of the doctrine of Mason v. Graham. Moreover, in the present case, we have no question of the integrity of the books, nor any difference of opinion respecting the total profits actually received. The sole question is over their apportionment. The second question is answered in the negative.

3. As we view it, this is the same question in another form, except that the 6,882 clutches were not sold separately, but billed separately in the sale of motorcycles which included the clutch, and here the defendants ask to apply this measure of profits, whereas in the 337 clutch sales the plaintiffs ask it. As affecting the question of profits, all that the bills mean is that the defendants said their profits were what the bills indicate. We think the plaintiffs could take them at their word, and ask for the allowance of that profit; but surely the defendants could not thrust their measure of profits upon the acceptance of the plaintiffs.

[4] 4. We do not pass upon the specific figures embodied in this question, but content ourselves with a statement of the principle. We have already indicated by holding the Mason v. Graham method to be inapplicable in answer to the general question. In determining profits actually received (with the damage element eliminated), the cost ratio basis of apportionment should be employed. This is upon the theory that the defendants are making clutches for the plaintiffs, and at the same time making motorcycles for themselves and selling the two together at a joint profit. The defendants cannot complain if it is assumed that they made the same profit (proportioned to outlay) upon what they sold for the plaintiffs as they did upon what they sold for themselves, and the plaintiffs must perforce accept this profit because it cannot be known that a greater profit was made on the clutch.

All efforts to find how much clutch and motorcycle had respectively contributed to the profits on both fritter themselves away into the purest speculations, built upon the most fanciful theories. Let it always be remembered that the plaintiffs had the right to assume that, if the defendants had not sold these clutches, they (the plaintiffs) would have sold them, and had thus been deprived of the thereby lost profits which they had the further right to recover by way of damages, and having the right to recover both profits and damages, if the profits returned by the defendants were disappointing to them, could have fallen back upon their claim to damages. They have expressed themselves, however, to be content to get the profits which the defendants received. This means actual profits, and not the profits on motorcycles, but the profits on clutches as nearly as the latter can be found.

The question thus becomes how the clutch profits are to be found. In this view, it is not true to say that the whole profit is ascribable to a part, any more than, if the plaintiffs had themselves manufactured and sold motorcycles with the patented clutch, it would have been true that the entire profit had been made on the clutch. Of course, there are cases (but

this is not one of them) in which there would be substantial truth in saying that what was sold was the patented thing, just as there is here in saying that the patented thing is the clutch which was sold, not the elements which make up the patented combination.

[5] 5. The answer to this question is that defendants cannot escape accountability for an infringement of the patent by selling the infringing clutch in parts. The sales without actuators should be included.

6. If we understand this question, it is in effect whether there is the same accountability for clutch 19 as for the other infringing clutches. This question has already been answered.

7. If we have the right grasp of this question, we have already answered it, because it asks whether, in apportioning joint profits between clutch and the other parts of the motorcycle, it is permissible to find how much the merits of the clutch have contributed to the sale, out of which the profits came, by assuming that the clutch has contributed one-half. Such an apportionment of profits on the merit basis is wholly arbitrary. It is really a mere sop to conscience. To ascribe to a part, which measured in cost is a small part, of the whole thing sold, the merit of having earned the whole profit, is a shock to the common sense of fairness. The shock is sought to be lessened by reducing it one-half. The shock to our sense of fairness is due not to the size of the figures, but to the recognized arbitrariness of the apportionment. No such basis should be adopted.

8. A specific answer to this question is dictated by a fact finding. This we leave as the master has found it. We answer the question in the abstract, by saying that, in applying the cost ratio principle of apportionment of profits, everything should go into the cost of the patented thing which makes up the thing which has been patented. If a more specific answer is needed than the findings of the master make of this answer, we later provide for it.

[6] 9. Repair profits should be included. Any one who buys a patented thing has the right to keep it in repair, and is guiltless of infringement in so doing. This is upon the same principle that a licensee is not an infringer. Every purchaser buys, along with the thing patented, all the property rights of an owner. In effect the patentee licenses him to make repairs. Of course, under the guise of repairs, he cannot make, and thereafter use or sell, a second thing covered by the patent. This would make of a sale a general license to make, use, or vend, which has

not been granted him; but, short of the creation of a new thing, he may keep in repair the one bought. It is clear, however, that an infringer is not within this principle. There has been no license of any kind granted to him, and he has no more right to use the property of the patentee to make repairs to an infringing thing than he had to make the infringing thing originally.

[7] 10. We are at a loss to see what profits tax has to do with the question under consideration, unless possibly in a secondary sense. What we are in search of is the sum of the profits. We are thus done with the question before the tax is levied. The defendants, we assume, returned as their profits a sum which was inclusive, not only of their profits, but those of the plaintiffs as well. This was wholly voluntary on their part, and concerned only themselves. If, for their own purposes, they chose to pay the government more tax than was due, how can that concern any one else? The plaintiffs, we assume, must include in their tax return whatever profits they eventually receive (if they ever get any), when they receive it and pay the tax levied thereon. We assume, as already stated, that the defendants included what is found to belong to the plaintiffs in the return on which they (the defendants) made their tax payment. In this sense they paid tax for the plaintiffs. If there was a surplus profit tax paid, the sum paid for the plaintiffs may have been less or more than the tax the plaintiffs would have paid had they received their share of the profits and returned it for tax purposes. If, when they come to pay the tax levied on their share of the taxes, they will receive a credit for what the defendants have paid for them, there is justice in allowing for this in the adjustment of accounts between the parties here.

We see nothing to be gained, however, by thus further complicating a problem already sufficiently complex. The defendants paid more tax than they should have paid. Let them get back the overpayment, if they can, and let the plaintiffs make their return for taxes when they get (if they ever do) their profits. These taxes, as we view it, are wholly out of the computation. Were whatever is paid to plaintiffs paid to them by way of a dividend or share in the profits, of course, profits taxes would be taken into account. What the plaintiffs get, however, is no share of the defendants' profits; it is merely measured by those profits, and the payment to them is no more a payment out of profits than what is paid for wages or supplies is a payment out of profits.

[8] 11. By the very same token, we have absolutely nothing to do with so-called "interest on investment," if this means interest on capital. At most it is nothing but a phrase anyhow, and a phrase suggested by a fancied analogy to a wholly different fact situation. The fancied or assumed situation has its purpose and use, and sometimes resort to it is not only helpful, but necessary because resort must be had to something, and a fancied "interest on investment" is as good an aid to reach the end sought, or a better than any other fancy. It not only, however, is of no aid in the solving of our problem, but confuses us by making "confusion worse confounded."

The thought can be most easily grasped by reducing the fact situation to its simplest form. A mechanic, who does all his own work, appropriates the patent of the plaintiffs by making and selling their clutch, receiving a "profit" therefrom. This "profit" is the common product of the property of the patentee, the acquired skill of the mechanic, the arts of the salesman, and all the other almost numberless elements which have contributed to it. The acquired skill of the mechanic has cost money. It is in the economic sense capital, and has a commercial value because it might be laid out and employed for a money return in the form of wages. Any one who was asked to state an account of the profits of the business of making clutches conducted by him might very well charge up to expense account the arbitrarily assumed or fancied value of his services as a mechanic. They might get a little nearer to "hard pan" by charging up to expenses the sum which would have been paid to a mechanic who was sufficiently skilled to do what the proprietor himself had done. This would be merely assuming that the infringer had hired himself at mechanic's wages. In this way they might reach the result that the net receipts of the proprietor were $1,000 for wages and $1,000 for the profits of the business; but it is clear that they would not have changed the fact that the infringer had received $2,000. All they would have done is to divide the sum into two parts and give a different name to each separate part.

At the same time, if the proprietor, in the attempt to sell the business on the basis of its profit-earning capacity per month or other period, were to boast that he had made $2,000 in the same period of time, he would have quickly had pointed out to him that he was adding to the profits of the business the value of his own services rendered to the business, and that the profits of the latter were only half what he supposed. In the same economic sense precisely the same thing is true of a corporation or other organization of capital in business. The only difference in the economic sense is that in the one case the invested capital is in the form of a man; in the other, it is in the form of money or other things into which the money capital contributed has been turned. The "interest on investment" phrase in the latter case is the precise economic equivalent of the "wages" phrase in the other.

If what is to be found is how much did the supposititious infringer receive (net) from his tortious manufacture and sale of clutches, the finding must be $2,000. So with these defendants. The finding to be made is, not the receipts (net) from their manufacture and sales after deducting a return to them on their investment, but how much of such receipts belong to the plaintiffs. When this is found and is deducted, the balance belongs to the defendants, out of which comes (in the form of a dividend) whatever return there is on their investment. In other words, the plaintiffs are an expense item, not sharers in earnings in the form of dividends or otherwise. In still other words, an applicable analogue is the case (with the tort-feasor feature eliminated by the renunciation of damages) of a clutch royalty measured by a patentee's share of total profits apportioned on the cost ratio basis of clutch and motorcycles. Such a royalty, when ascertained, would be paid before either profit taxes or "interest on investment."

If, at the cost of tiresomeness, we may venture upon another illustration, the distinction we are trying to make between the profit on a particular manufacture and the profits out of which "interest on investment" is paid is brought out by the fact (which might be a fact) that motorcycles might be made at a profit of $50 (the clutch share of which was $1), and yet the concern making them might be so heavily capitalized that the "interest on investment" would be very small, or indeed less than nothing. The real point we are seeking to make is that in such a case the clutch would get the $1 and "interest on investment" must be paid out of the $49. There is, of course, a sense in which "interest on investment" is an expense item.

Returning to our supposititious individual infringer, if he had borrowed a lathe as an aid to manufacture and had paid for the use of it, this would go down as an expense item. If he had bought a lathe and had it on hand, the cost of it less its after value might likewise be well regarded as an expense item. All such items of expense are often, if not

usually, provided for by a more or less arbitrary charge to depreciation or equivalent account before an account of profits·is struck, and we assume this has been done here. This distinction is that made in the cases between interest on capital and interest allowed on investment. We understand the question to refer to interest on·capital. As such it should not be allowed.

12. We understand this question to be directed to the act of Congress which provides in effect that, when the government is in need of a patented thing, any one may supply it without incurring the liabilities of an infringer to the patentee, who must look for redress, not to the infringer, but to the government. We see no reason for holding that this infringer is, with respect to this act, in any different situation from any other. During the period to which the act is applicable, the redress of the injured party must be sought from the government. In so holding the master committed no error.

13. The answer to this question takes us back to the question already discussed with overfullness. The profit of which we are in search is the profit on clutches sold, not a balance sheet bookkeeping statement of the value of the assets and amount of the liabilities of the company. The two things, although, of course, in a secondary sense related, are none the less wholly distinct. The "loss" here referred to was nothing else than a bookkeeping fiction. It is properly to be ignored.

14. The motions to reopen were properly denied.

15. The question of interest allowance will be disposed of when a formal final decree is entered.

We have thus at doubtless painful length discussed and answered (with the exception of the last) all the questions submitted. This has been done in the hope that the conclusions stated will enable counsel to submit the draft of a decree which will, so far as concerns this court for the time being, end this almost interminable litigation. The main questions are the inclusion of clutch 19 in the accounting, and whether the profits ascribable to the clutch should be found by the apportionment of the motorcycle profits on the cost ratio basis, or be assumed to be on all clutches the like profit made on the 337 sold separately.

We have assumed that the expert accountants can readily give us a statement of account upon being informed what to include and what to exclude.

Counsel may submit the draft of a formal decree effectuating these findings.