## RUTH v. STEARNS-ROGER MFG. CO.
### No. 9178.

District Court, D. Colorado.

Dec. 23, 1935.

of the apparatus manufactured and/or sold by Stearns-Roger Manufacturing Company, which embody the invention of patent No. 1,277,750 as set forth in claims 1 and 3 thereof, and the profits which Stearns-Roger Manufacturing Company has received or which have accrued to it and/or the damages which Joseph P. Ruth, Jr., has suffered by reason of such infringement.

### Findings of Fact.

The plaintiff, Joseph P. Ruth, Jr., hereinafter called Ruth, is the assignee of letters patent No. 1,277,750, granted to Jackson A. Pearce, September 3, 1918.

The defendant, Stearns-Roger Manufacturing Company, hereinafter called Stearns-Roger, is a corporation engaged, among other things, in the manufacture and sale of mining and milling machinery, and in the course of its business infringed claims 1 and 3 of the patent in suit, as held by the Circuit Court of Appeals of this circuit in Stearns-Roger Mfg. Co. v. Ruth, 62 F.(2d) 442, 449.

The infringing or accounting period begins on June 28, 1928, at which time Ruth caused to be attached to flotation machines manufactured and sold by him patent notice plates. From and after November 30, 1928, Stearns-Roger had actual notice of the patent in suit.

Before the taking of testimony, on motion of counsel for Stearns-Roger, filed in accordance with Equity Rule 59, 28 U.S.C.A. following section 723, the master entered an order directing Stearns-Roger to prepare and file an account in accordance with Equity Rule 63, 28 U.S.C.A. following section 723, specifying the information that such account should contain. Said order, in addition to requiring an account on the infringing devices, required an account on all parts made and sold by Stearns-Roger contributing to the infringement. On April 12, 1933, Stearns-Roger filed an account certified to as correct by H. C. Morey, secretary, covering two 6-cell flotation machines sold to the Colorado School of Mines, Golden, Colo., in 1930. A motion was filed with the account to quash that part of the order requiring an accounting on the parts. The motion to quash was denied. Ruth objected to the account and moved for an order on Stearns-Roger requiring it to file blueprints of all flotation apparatus manufac-

Max Melville, of Denver, Colo., for plaintiff.

Forrest C. Northcutt and Jesse G. Northcutt, both of Denver, Colo., for defendant.

PHILLIPS, Circuit Judge.

This cause came on for hearing on exceptions filed by the defendant to the report of the special master. Oral arguments were presented and written briefs filed. Thereafter, an application was presented to the Court of Appeals for leave to file in the District Court, an original bill in the nature of a bill of review. The application was denied. See Stearns-Roger Mfg. Co. v. Ruth (C.C.A.10) 79 F.(2d) 425. The opinion on the application to file the bill of review, disposes of one of the principal questions here presented, adversely to the defendant.

The special master has filed herein, an excellent report, which manifests thoroughness and ability. It should serve as a model in future patent accounting cases.

In it, the special master has considered each of the questions here presented. I agree with his reasoning and his conclusions, and therefore, incorporate his report in this opinion. It follows:

### Report of Robert B. Cartwright, Special Master.

This cause was referred to the undersigned as special master on an order of reference entered by the court the 13th day of February, 1933, to ascertain, take, state, and report to this court an account

tured since June 15, 1928, and to render a further account in compliance with the master's order. Blueprints of 14 machines sold by Stearns-Roger subsequent to June 28, 1928, were filed. These blueprints, Defendant's Exhibits 1–A to 1–E, inclusive, were compared with drawing No. 4965, Exhibit I in the infringement suit in the District Court, which represents the machine the Court of Appeals held to be an infringement. The machines represented by such blueprints, aside from dimensional differences, were in all material respects similar to the infringing machine. The parts used were identical, their arrangement was the same, and the same process was employed. The sands holes were in the same relative position and were the same size or smaller than the sands hole in the infringing machine.

Machines represented by such blueprints sold by Stearns-Roger subsequent to June 28, 1928, are:

| Location | Date Shipped |
|---|---|
| R. D. Webb | November 21, 1928 |
| Colo. Lead Zinc Co. | December 7, 1928 |
| Xichu Mining Company | March 26, 1929 |
| International Smelting Co. | April 15, 1929 |
| Piermont Mines | July 3, 1929 |
| Climax Molybdenum Company | August 12, 1929 |
| Vertex Mining Company | September 13, 1929 |
| Shenandoah Dives Mining Co. | September 21, 1929 |
| Shenandoah Dives Mining Co. | October 28, 1929 |
| Colo. School of Mines | February 15, 1930 |
| Cia Minera Fundidora | March 20, 1930 |
| Colorado School of Mines | May 31, 1930 |
| Willow Creek Mines | July 14, 1930 |
| W. R. Hall | December 1, 1931 |

Counsel for Stearns-Roger took the position that such machines, with the exception of two sold to the Colorado School of Mines, were different, in that sands holes were employed, that such sands holes were necessary and essential for proper operation, and that a substantial part of the tailings was discharged through such sands holes. An offer of proof was made to sustain such contention.

All evidence with respect to the amount of tailings which discharge through the sands hole was rejected, for the reason that that issue had been tried and decided by the court. The Circuit Court in Stearns-Roger Mfg. Co. v. Ruth, supra, said: "The sands hole, as compared with the opening over the weir, is very small and only a slight and insignificant amount of tailings will escape through the sands hole, as compared with the amount which will pass over the weir. Therefore, even with the sands hole open, by increasing the speed of the impeller, substantially all of the tailings will be forced over the weir, the proper pulp level will be automatically maintained, and the principle of the patent in suit will be appropriated. We conclude that the sands hole effects a slight change in efficiency alone, that it is not essential to the device, and that, notwithstanding it, the alleged infringing device employs the principle and appropriates the substance of the patent."

Since the above is the law of the case and decides the issue of sands holes, I limited by inquiry to their size and relative position in the machines. After determining that the sands holes in the above machines were in the same relative position as the sands hole in the infringing machine and were the same size or smaller, a further account was ordered.

Stearns-Roger thereupon filed an account, Exhibit A, covering such machines. Morey and other officials and employees of Stearns-Roger were produced before the master at Denver where the books and records were.

### Extras.

In the statement of account (Exhibit A) submitted by Stearns-Roger on infringing machines, the shop cost reported therein on some of the machines contains, in addition to the cost of the infringing machine, the cost of extras which were sold with the machine. These extras consisted of motors, texrope drives, texropes and switches, and were no part of the infringing unit proper. The sale price of such extras is also reported in the selling price.

The following table, marked A, shows the sale price of extras and the cost of extras:

### TABLE A

| Machine | Sale Price of Extras | Cost of Extras |
|---|---|---|
| Colorado Zinc Lead Co. | $ 328.00 | $ 233.93 |
| International Smltg. Co. | 150.00 | 150.00 |
| Piermont Mines | 532.00 | 478.28 |
| Climax Molybdenum Co. | 1,200.00 | 1,067.20 |
| Vertex Mining Co. | 1,516.00 | 1,102.64 |
| Shenandoah Dives Mng. Co. | 470.00 | 391.80 |

The following table, marked B, shows the sale price of infringing machines, sales price of extras deducted, and cost of infringing machines, cost price of extras deducted:

## TABLE B

| Machine | Sale Price | Cost |
|---|---|---|
| R. D. Webb | $ 5,586.00 | $ 3,934.44 |
| Colorado Zinc Lead Co. | 5,688.00 | 4,138.97 |
| Xichu Mining Co. | 7,760.00 | 5,442.02 |
| International Smltg. Co. | 17,450.00 | 12,933.83 |
| Piermont Mines | 3,688.00 | 2,371.72 |
| Climax Molybdenum Co. | 4,017.00 | 3,804.23 |
| Vortex Mining Co. | 3,984.00 | 3,156.17 |
| Shenandoah Dives Mng. Co. | 2,180.00 | 1,697.48 |
| Shenandoah Dives Mng. Co. | 17,280.00 | 1,635.22 |
| Colo. School of Mines | 542.00 | 495.85 |
| Cia Minera Fundidora | 4,700.00 | 3,838.59 |
| Colo. School of Mines | 697.50 | 713.13 |
| Willow Creek Mines | 1,665.23 | 1,785.64 |
| W. R. Hall | 950.00 | 579.48 |

## Shop Cost.

The infringing machines were constructed in the shops of the General Iron Works at Denver in accordance with plans and specifications furnished by Stearns-Roger. General Iron Works supplied the labor and all material necessary which it carried in stock. Other material needed in the construction of such machines was supplied by Stearns-Roger. Upon completion of a machine, General Iron Works furnished Stearns-Roger with an invoice which included the cost of materials furnished it and a charge for labor. In arriving at cost, Stearns-Roger took the amount of this invoice and added cost of materials supplied by it and a charge for drafting. Some of the materials furnished by Stearns-Roger were purchased with the privilege of discounting the bill. It availed itself of such privilege in some instances. However, in arriving at cost of the machines, the original charge for such materials was added, and no allowance was made for the cash discounts. Drawings for each machine were made by its drafting department. The drafting charge for each machine was arrived at by taking the cost of materials used and the cost of direct labor; 100 per cent. was added to direct labor for supervision and overhead. Mr. Morey testified that 100 per cent. was added to direct labor since experience had proved that to be the correct percentage attributable to each drafting job. This was the method regularly used by Stearns-Roger in the conduct of its business.

The selling price of each machine is not in dispute, and the only items in dispute making up the shop cost of such machines are items of drafting and cash discounts.

■ The charges for drafting are objected to on the ground that an arbitrary figure of 100 per cent. overhead was added to direct labor.

There was some overhead expense connected with each drafting job. Supervision was also required. Stearns-Roger, through experience, found that 100 per cent. of the direct labor added to actual cost accurately reflected the overhead and supervision burden. That seems reasonable for such work as drafting. The charges for drafting will be allowed in full as part of cost.

■ Materials purchased for the infringing machines by Stearns-Roger should be included in cost at the price Stearns-Roger actually paid for such materials and not at the price charged. The discounts are therefore being deducted from costs.

The following table, marked C, shows selling price and shop cost of infringing machines (see table A), discounts which are deducted from shop cost and gross profits. The items of drafting challenged are shown but are not deducted from shop cost:

## TABLE C

| Machine | Selling Price | Shop Cost | Draft Chal. not Ded. from Cost | Discount | Shop Cost Less Discount | Gross Profit |
|---|---|---|---|---|---|---|
| R. D. Webb (Sold through Hendrie & Bolthoff) | $ 5,586.00 | $ 3,934.44 | $214.26 | | $ 3,934.44 | $1,651.56 |
| Colo. Zinc Lead Co. | 5,688.00 | 4,138.97 | 96.00 | | 4,138.97 | 1,549.03 |
| Xichu Mining Co. | 7,760.00 | 5,442.02 | 141.37 | | 5,442.02 | 2,217.98 |
| International Smltg. Co. | 17,450.00 | 12,933.83 | 299.68 | $36.28 | 12,897.55 | 4,552.45 |
| Piermont Mines | 3,688.00 | 2,371.72 | 137.85 | | 2,371.72 | 1,316.28 |
| Climax Molybdenum | 4,017.00 | 3,804.23 | 332.63 | | 3,804.23 | 212.77 |
| Vortex Mng. Co. | 3,984.00 | 3,156.17 | 75.00 | | 3,156.17 | 827.83 |
| Shenandoah Dives | 2,180.00 | 1,697.48 | 75.00 | | 1,697.48 | 482.52 |
| Shenandoah Dives | 17,280.00 | 11,685.22 | 150.00 | 23.29 | 11,661.93 | 5,618.07 |
| Colo. Sch. Mines | 542.00 | 495.85 | 68.10 | | 495.85 | 46.15 |
| Cia Minera Fundidora | 4,700.00 | 3,838.59 | 24.77 | | 3,838.59 | 861.41 |
| Colo. Sch. Mines | 697.50 | 713.13 | 110.44 | | 713.13 | 16.13 Loss |
| Willow Creek Mines | 1,665.23 | 1,785.64 | 200.27 | | 1,785.64 | 120.41 Loss |
| W. R. Hall | 950.00 | 579.48 | 51.43 | | 579.48 | 370.52 |

## Engineering Fees.

During the time the infringing sales were made by Stearns-Roger, Minerals Separation North American Corporation was the holder of the Wilkinson-Littleford patent. Through conversations and correspondence, arrangements were made whereby Stearns-Roger was permitted to manufacture and sell flotation machines covered by the patent.

Sales of the infringing machines were made by Stearns-Roger, but only to the purchasers who were licensees of Minerals Separation Company. Before a machine was shipped to a purchaser, Stearns-Roger ascertained from Minerals Separation Company whether the purchaser had been licensed by it. Minerals Separation Company furnished Stearns-Roger with a master drawing or blueprint for each machine, and it was constructed in accordance with such drawing. Before a machine was shipped, a Wilkinson-Littleford notice plate furnished by Minerals Separation Company was attached to such machine by Stearns-Roger. Stearns-Roger agreed to pay Minerals Separation Company 10 per cent. of the gross sales price of each machine as an engineering fee. The 10 per cent. engineering fee was not to be paid until the sale price of a machine was received by Stearns-Roger.

From the time Stearns-Roger commenced making the infringing machines, Minerals Separation Company insisted that the payment be called an engineering fee and not a royalty.

On November 30, 1928, Stearns-Roger received notice from Ruth that the machines manufactured and sold by it under the Wilkinson-Littleford patent infringed the Pearce patent. Minerals Separation Company had notice of Ruth's claim of infringement as early as December 3, 1928. Subsequently to December 3, 1928, Stearns-Roger continued to sell to licensees of Minerals Separation Company machines constructed in accordance with master drawings furnished by that company and paid an engineering fee on each machine sold when the purchase price had been collected in full.

The amounts paid and to be paid by Stearns-Roger to Minerals Separation Company are shown by the following table marked D:

### TABLE D

| Date Shipped | To Whom | Engineering Fee |
|---|---|---|
| 11/21/28 | R. D. Webb | $ 558.60 |
| 12/ 7/28 | Colo. Zinc Lead Co. | 668.80 |
| 3/26/29 | Xichu Mining Co. | 776.00 |
| 4/15/29 | International Smelt. Co. | 1,745.00 |
| 8/12/29 | Climax Molybdenum Co. | 401.70 |
| 9/13/29 | Vertex Mining Co. | 398.40 |
| 9/21/29 | Shenandoah Dives Mng. Co. | 218.00 |
| 10/28/29 | Shenandoah Dives Mng. Co. | 1,728.00 |
| 3/20/30 | Cia Minera Fundidora | 362.00 |
| 7/14/30 | Willow Creek Mines | 124.00 |
|  | Total paid | $6,880.50 |
| 12/ 1/31 | W. R. Hall (unpaid) | 95.00 |
| 7/ 3/29 | Piermont Mines (unpaid) | 368.80 |
|  | Total paid and unpaid | $7,344.30 |

Stearns-Roger contends that it is entitled to deduct these engineering fees from the gross receipts of infringing machines.

Ruth insists that Minerals Separation Company and Stearns-Roger were coinfringers and that the 10 per cent. engineering fee was in reality a division of profits, and as such was not an item of expense which could be deducted from profits.

The engineering fee was not a royalty. Its payment was contingent upon receipt by Stearns-Roger of the purchase price of an infringing machine. Both parties cooperated in the manufacture and sale of such machines, were coinfringers, and as such shared in the profits. The sums paid and to be paid by Stearns-Roger to Minerals Separation Company, as engineering fees are disallowed as items of expense.

### Contributory Infringement.

Counsel for Stearns-Roger took the position that, since a user of a patented combination had the right to keep it in repair, the sale of parts by Stearns-Roger to such users did not constitute contributory infringement. After the motion to quash that part of the order requiring an accounting on parts which contributed to the infringement was overruled, H. C. Morey, secretary, and Harvey Mathews, sales engineer for Stearns-Roger, were produced before the master and examined concerning sales of parts made subsequent to June 28, 1928.

Subsequently to June 28, 1928, Stearns-Roger received orders for flotation machine parts from Shenandoah Dives Mining Company and Willow Creek Mines. The parts shipped under such orders were for use in the infringing machines sold by

Stearns-Roger shown in table A. These parts contributed to the infringement of claims 1 and 3 of the Pearce patent.

The following table marked E shows the parts sold and gross profits realized thereon:

aration subaeration flotation machines, one Fahrenwald, and two Hunt pneumatics. These machines were all used in the laboratory and were cut up and changed from day to day. Their use was experimental. With the exception of one metal

### TABLE E

| Date Shipped | Customer | Parts | Sale Price | Cost | Gross Profit |
|---|---|---|---|---|---|
| 9/ 9/30 | Shenandoah Dives Mng. Co. | 40–21″ Imp. | $1,220.00 | $523.58 | $ 696.42 |
| 5/22/31 | Shenandoah Dives Mng. Co. | 68 Liner Plates | 476.00 | 352.10 | 123.90 |
| 7/30/31 | Shenandoah Dives Mng. Co. | 45 Imp. 6 Liner | 1,166.75 | 625.64 | 541.11 |
| 1/14/32 | Shenandoah Dives Mng. Co. | 3 Spindle Shafts | 63.50 | 48.59 | 14.91 |
| 2/15/32 | Shenandoah Dives Mng. Co. | 71–21″ Imp. | 1,939.00 | 895.57 | 1,043.43 |
| 5/10/32 | Shenandoah Dives Mng. Co. | 54 Stocking for Nozzle | 50.96 | 39.05 | 11.91 |
| 5/25/32 | Shenandoah Dives Mng. Co. | 8 Flanges & 8 jets | 28.50 | 21.01 | 7.49 |
| 6/22/32 | Willow Creek Mines | 4–Imp. | 103.57 | 66.75 | 36.82 |
| 10/13/32 | Shenandoah Dives Mng. Co. | 20–21″ Imp. | 580.00 | 227.93 | 352.07 |
| 11/11/32 | Shenandoah Dives Mng. Co. | 20–21″ Imp. | 580.00 | 222.29 | 357.71 |
| 3/16/33 | Willow Creek Mines | 6–Imp. | 124.00 | 60.50 | 63.50 |

Subsequently to June 28, 1928, Stearns-Roger sold parts to a number of other concerns. Each one of these concerns had one or more Minerals Separation subaeration flotation machines constructed in all material respects in conformity with blueprints marked Exhibits 1–A to 1–E. These parts sold by Stearns-Roger are shown by the following table marked F:

tank shipped November 22, 1928, and special flanges shipped May 14, 1929, the parts ordered by the Colorado School of Mines were for Minerals Separation Laboratory machines.

The evidence is insufficient to show that the metal tank and flanges contributed to the use of an infringing machine. With

### TABLE F

| Date Shipped | Customer | Parts | Sale Price | Cost |
|---|---|---|---|---|
| 7/ 9/28 | Colorado Sch. Mines | 2 metal tanks | $ 256.00 | $ 231.93 |
| 8/25/28 | Am. Metals Co. | 100–18″ Imp. | 1,981.00 | 1,058.04 |
| 10/31/28 | Rawley Mines Inc. | 24–18″ Imp. | 480.00 | 262.41 |
| 10/22/28 | Colo. Sch. Mines | 1 metal tank | 118.00 | 116.49 |
| 1/ 4/29 | Rawley Mines Inc. | 24 sets grids | 101.50 | 75.17 |
| 1/21/29 | Rawley Mines Inc. | 12–18″ Imp. | 240.00 | 141.14 |
| 3/ 8/29 | Leadville Zinc Lead Co. | 24–21″ Imp. | 936.00 | 482.38 |
| 3/18/29 | Rawley Mines Inc. | 24 baffles | 135.00 | 109.02 |
| 3/23/29 | Chas. A. Chase, Agt. | 14 Imp. | 280.00 | 163.11 |
| 5/ 6/29 | Colo. Sch. Mines | 6–7″ Imp. | 26.50 | 23.46 |
| 5/14/29 | Colo. Sch. Mines | Spec. flanges | 91.00 | 85.99 |
| 6/21/29 | Rawley Mines Inc. | 48 grids | 101.50 | 71.08 |
| 6/22/29 | Am. Metals Co. | 80–18″ Imp. | 1,520.00 | 779.26 |
| 6/25/29 | Rawley Mines Inc. | 24–18″ Imp. | 480.00 | 265.00 |
| 10/25/29 | Shenandoah Dives Mng. Co. | 14–18″ Imp. | 280.00 | 159.33 |
| 11/16/29 | Rawley Mines Inc. | 12 baffles | 67.50 | 54.00 |
| 12/31/29 | Am. Metals Co. | 80–18″ Imp. | 1,520.00 | 841.58 |
| 1/ 9/30 | Colo. Sch. Mines | 12–7″ Imp. | 60.00 | 36.72 |
| 2/27/30 | Colo. Sch. Mines | 6–7″ Imp. | ...... | 51 88 |
| 3/ 8/30 | Leadville Zinc Lead Co. | 12–21″ Imp. | 366.00 | 324.18 |
| 5/ 1/30 | Rawley Mines Inc. | 6–18″ Imp. | 148.30 | 87.47 |
| 5/21/30 | Am. Metals Co. | 8 baffles 15″Imp. | 176.00 | 109.93 |
| 8/21/30 | Leadville Zinc Lead Co. | 12–21″ Imp. | 366.00 | 184.59 |
| 10/28/30 | Colo. Sch. Mines | 12–7″ Imp. | 51.00 | 40.68 |
| 3/ 3/31 | Colo. Sch. Mines | 12–7″ Imp. | 60.00 | 169.19 |
| 7/13/31 | Am. Metals Co. | 12 Imp. | ...... | 183.43 |
| 9/28/31 | Am. Metals Co. | 50–18″ Imp. | 650.00 | 509.40 |
| 1/ 4/32 | Chain O'Mines | 7–18″ Imp. | 140.00 | 66.07 |
| 1/29/32 | Am. Metals Inc. | 30–18″ Imp. | 390.00 | 285.75 |
| 7/ 8/32 | Am. Metals Inc. | 12 shafts | 129.00 | 92.57 |

The Colorado School of Mines, which is shown on table F as a purchaser of parts, had various kinds of flotation machines, some of which were Minerals Sep-

respect to the other sales of parts, they were for use in laboratory machines used for experimental purposes, and consequently did not contribute to an infringing use.

The American Metals Company, shown on table F, had several Minerals Separation flotation machines, all of which were subaeration, a Hebbard, and three of their own make. Stearns-Roger sold six of the Minerals Separation subaeration machines to the American Metals Company. Impellers sold for Minerals Separation subaeration machines could be used in the other flotation machines.

The parts shipped to American Metals Company under dates of August 25, 1928, June 22, and December 31, 1929, January 29 and July 8, 1932, were Minerals Separation flotation machine parts and were shipped under orders calling for Minerals Separation flotation parts. These sales were infringing sales.

The parts shipped on May 31, 1930, were to fill an order calling for baffles in an 18-inch subaeration machine and eight Minerals Separation 15-inch impellers. Impellers were used in conditioners as well as in flotation machines. The American Metals Company did not have any 15-inch Minerals Separation subaeration flotation machines. The evidence was therefore insufficient to show that these impellers contributed to an infringing use. The cost and sale price of the entire order was shown, but no evidence was offered by Ruth to show the profit on the baffles, and it was not shown that the books of Stearns-Roger were so kept as to make a separation impossible. The entire sale is therefore eliminated.

There is no evidence to show that the parts shipped on September 28, 1931, were for use in an infringing machine. The shipment of July 13, 1931, was not a sale but a replacement, and is allowed as a deduction from profits.

The Rawley Mines, Inc., shown on table F, had Minerals Separation flotation machines, all of which were the subaeration type. The orders for parts shipped October 31, 1928, January 4, January 21, June 21, June 25, 1929, and May 1, 1930, called for Minerals Separation subaeration flotation machine parts and the parts shipped were for use in such machines. The orders shipped March 18 and November 16, 1929, called for baffles for Minerals Separation machines, and Minerals Separation baffles constructed according to drawings were shipped. These were all infringing sales.

The order from Charles A. Chase, agent, called for Minerals Separation flotation machine impellers, and such impellers were shipped for use in a subaeration machine. This was an infringing sale.

The Leadville Zinc Lead Company, formerly Colorado Zinc Lead Company, shown on table F, had several Minerals Separation subaeration machines. It also had conditioners which used impellers. The impellers shipped March 8, 1929, were for use in the infringing machine sold by Stearns-Roger which is involved in this accounting. This was an infringing sale.

The evidence is insufficient to show that parts sold and shipped on March 8 and August 21, 1930, contributed to the infringement.

The parts shipped to the Shenandoah Dives Mining Company and Chain O' Mines were for use in Minerals Separation subaeration flotation machines, and such sales contributed to the infringement of claims 1 and 3 of the Pearce patent.

The following table marked G is a revision of table F. Only those sales contributing to the infringement are shown:

## TABLE G

| Date Shipped | Customer | Parts | Sale Price | Cost | Gross Profit |
|---|---|---|---|---|---|
| 8/25/28 | Am. Metals Co. | 100–18″ Imp. | $1,981.00 | $1,058.04 | $922.96 |
| 10/31/28 | Rawley Mines Inc. | 24–18″ Imp. | 480.00 | 262.41 | 217.59 |
| 1/ 4/29 | Rawley Mines Inc. | 24 sets grids | 101.50 | 75.17 | 26.33 |
| 1/21/29 | Rawley Mines Inc. | 12–18″ Imp. | 240.00 | 141.14 | 98.86 |
| 3/18/29 | Rawley Mines Inc. | 24 baffles | 135.00 | 109.02 | 25.98 |
| 3/ 8/29 | Leadville Zinc Lead | 24–21″ Imp. | 936.00 | 482.38 | 453.62 |
| 3/28/29 | Chas. A. Chase, Agt. | 14–Imps. | 280.00 | 163.11 | 116.89 |
| 6/22/29 | Am. Metals Co. | 80–18″ Imp. | 1,520.00 | 779.26 | 740.74 |
| 6/21/29 | Rawley Mines Inc. | 48 grids | 101.50 | 71.08 | 30.42 |
| 6/25/29 | Rawley Mines Inc. | 24–18″ Imp. | 480.00 | 265.00 | 215.00 |
| 10/25/29 | Shenandoah Dives Mng. Co. | 14–18″ Imp. | 280.00 | 159.33 | 120.67 |
| 11/16/29 | Rawley Mines Inc. | 12 baffle plates | 67.50 | 54.00 | 13.50 |
| 12/31/29 | Am. Metals Co. | 80–18″ Imp. | 1,520.00 | 841.58 | 678.42 |
| 5/ 1/30 | Rawley Mines Inc. | 6–18″ Imp. | 148.30 | 87.47 | 60.83 |
| 1/ 4/32 | Chain O'Mines | 7–18″ Imp. | 140.00 | 66.07 | 73.93 |
| 1/29/32 | Am. Metals Co. | 30–18″ Imp. | 390.00 | 285.75 | 104.25 |
| 7/ 8/32 | Am. Metals Co. | 12 shafts | 129.00 | 92.57 | 36.43 |

Note:—"Imp." referred to in the above table stands for impeller.

## Interest on Investment.

■ Counsel for Ruth insists that Stearns-Roger is not entitled to an allowance for interest on investment, for the reason that the infringing business was only a small part of the total company business, and the credits claimed were not properly allocated to the infringing sales.

Stearns-Roger arrived at its claimed allowance for interest on investment for infringing machines and parts by taking 6 per cent. of the sum of the capital and surplus in each year involved as interest on investment on the entire business. It then allocated interest on investment to the infringing business by determining the percentage relation between gross sales of the infringing business and gross sales of the entire business in each year and taking that percentage of interest on the entire investment as the proper allowance for the investment used in producing the infringing profits.

During the entire period covered by this accounting, the infringing business was a very small part of the entire company business. Gross infringing sales were less than 2 per cent. of total sales. The infringing machines, which make up the major portion of infringing business, were constructed in the shops of the General Iron Works. Machines were not kept in stock by Stearns-Roger, but were constructed only when orders were received. The only evidence offered to show invested capital was Defendant's Exhibit G. This exhibit shows the capital stock and surplus of Stearns-Roger for each of the years involved in this accounting.

Since there was no showing that any assets were actually used in producing the infringing business, no credit for invested capital can be allowed.

## Sales Expense.

■ During the period involved herein, the business of Stearns-Roger was divided into four departments; namely, mining department, power department, Chicago pneumatic tool department, and office department. The mining department handled all kinds of mining machinery, including the infringing business, and, in addition, did general mining construction work. The infringing business constituted approximately 10 per cent. of the business handled by the mining department, and the mining department business constituted approximately 17 per cent. of the entire company business.

In arriving at the cost of each infringing article, no attempt was made to charge exact amounts of sales expense against such article. Mr. Morey testified that exact amounts were not determinable. The cost of sales made was arrived at by a system of cost accounting. All expenses incurred by the mining department during each year were charged to it. A portion of the general expenses of the entire business for each year was prorated to the mining department. The proration to the mining department of administrative expense was arrived at by estimating the amount of time the administrator spent on the department. In the account for infringing business submitted by Stearns-Roger, the total gross profit on such business for each year was diminished by that portion of the sales expense of the mining department for each year prorated to the infringing business. This proration was arrived at by ascertaining the percentage relation between the expenses of the mining department and the cost of sales of that department and taking that percentage of the cost of infringing sales as the sales expense of the mining department.

Credits claimed on account of sales expense are as follows:

|      | Machines   | Parts    |
|------|------------|----------|
| 1928 | $1,651.08  | $292.05  |
| 1929 | 3,344.40   | 217.78   |
| 1930 | 2,305.55   | 427.81   |
| 1931 | 249.56     | 680.70   |
| 1932 |            | 308.60   |
| 1933 |            | 21.17    |

These claimed credits represent sales expense apportioned to all infringing business. No adjustments were made for unprofitable sales. The items of expense charged to the mining department and the prorated amounts from the general expenses of the company for the years 1928 to 1931, inclusive, are shown on Plaintiff's Exhibits E and F. These items consist of salesmen's salaries and commissions, stenographer, supplies, telephone and telegraph, insurance, traveling and automobile expense, entertainment, dues, sales estimates, magazines, development, miscellaneous and advertising. The prorated amounts consist of administrative expense,

shop expense, I. R. expense, drafting, and general expense.

The credits claimed for sales expense were objected to by Ruth, and, in addition, each of the items making up sales expense of the mining department were challenged.

With the exception of commission paid to salesmen and salesmen's salaries which will be hereafter considered, there is no evidence of any of the items which make up mining department expense except Plaintiff's Exhibits E and F. These items of expense were incurred and paid, but there is no evidence to show that such expenses or any part of them were made necessary or incurred in the carrying on of the infringing business.

Since there is no direct proof that reasonably certain parts of any of the above expense items, exclusive of commissions, were incurred in infringing business, no direct deductions from infringing profits can be made, and, since there is no proof that any of the above items of expense were incurred in part in the infringing business, except salesmen's salaries, and such part is not determinable, there is nothing upon which to base an apportionment.

## Commissions and Salaries of Salesmen.

■ During the infringing period the mining department employed two sales engineers. These men sold all kinds of mining machinery, including infringing machines and parts. As remuneration for their work, each received a salary and commissions on sales made. The commissions paid were arrived at by taking 10 per cent. of the gross profit of a sale.

Counsel for Ruth objected to the allowance of commissions as a credit against profits on the ground that they were a division of profits.

The commissions were received on noninfringing as well as on infringing sales. They were a part of the remuneration received by the salesmen for their services, and such commissions were not unreasonable.

Commissions paid to salesmen on infringing machine sales are shown by the following table marked H:

### TABLE H

| R. D. Webb | $110.63 |
| Colorado Zinc Lead Co. | 106.43 |
| Xichu Mining Co. | 154.19 |
| International Smelting Co. | 277.11 |
| Piermont Mines | 80.12 |
| Vertex Mining Co. | 84.28 |
| Shenandoah Dives Mining Co. | 32.27 |
| Shenandoah Dives Mining Co. | • 386.67 |
| Colorado School Mines | 4.75 sold 2/15/30 |
| Cia Minera Fundidora | 49.19 |

The following table marked I shows commissions paid to salesmen on the infringing sales shown on Table E:

### TABLE I

| | | Date Shipped |
|---|---|---|
| Shenandoah Dives Mining Co. | $ 69.64 | 9/ 9/30 |
| Shenandoah Dives Mining Co. | 12.39 | 5/22/31 |
| Shenandoah Dives Mining Co. | 54.11 | 7/30/31 |
| Shenandoah Dives Mining Co. | 104.34 | 2/15/32 |
| Shenandoah Dives Mining Co. | 35.20 | 10/12/32 |
| Shenandoah Dives Mining Co. | 35.77 | 11/11/32 |

The following table marked J shows commissions paid to salesmen on the infringing sales shown on table G:

### TABLE J

| American Metals Co. | $92.29 | 8/25/28 |
| Rawley Mines Inc. | 21.75 | 10/31/28 |
| Leadville Zinc Lead Co. | 45.00 | 3/ 8/29 |
| American Metals Co. | 74.07 | 6/22/29 |
| Rawley Mines Co. | 27.10 | 6/25/29 |
| American Metals Co. | 67.84 | 12/31/29 |
| Rawley Mines, Inc. | 6.08 | 5/ 1/30 |

The above amounts are allowed as credits against profits on the sales on which they were paid.

■ No attempt was made to show the approximate proportion of time spent by salesmen in selling infringing machines and parts. However, Mr. Morey testified that it was impossible to allocate definitely to each machine the actual overhead expense incurred in making and selling such machine.

I have apportioned a part of salesmen's salaries to infringing business by following the method used in Flat Slab Patents Co. v. Turner (C.C.A.8) 285 F. 257, 277; that is, by finding the percentage relation between the gross sales of the infringing business and gross sales of the mining department and taking that percentage of salesmen's salaries as the portion attributable to infringing machines. I have taken the gross sales of the mining department,

rather than gross company sales, since the salesmen were employed in that department and devoted their time to producing infringing and noninfringing business in that department and did not produce the other company business. I have eliminated unprofitable sales from the gross sales of infringing business in arriving at the percentage in order to avoid any diminution of profits by expenses attributable to unprofitable sales.

The following table marked K shows gross sales of the mining department taken from Exhibit F, the gross sales of the infringing business taken from tables C, E, and G, unprofitable sales being eliminated, the percentage relation between such amounts, the salesmen's salaries shown by Exhibit F, and the credit against infringing profits.

### TABLE K

|  | 1928 | 1929 | 1930 | 1931 |
|---|---|---|---|---|
| Mining Dept. | $177,680.28 | $606,735.12 | $97,043.60 | $68,840.20 |
| Infringing Sales | 13,735.00 | 62,020.50 | 6,610.30 | 2,592.75 |
| Percentage | .077 | .102 | .0679 | .0376 |
| Salaries | 6,500.00 | 6,850.00 | 6,450.00 | 6,300.00 |
| Credit | 500.50 | 698.70 | 438.00 | 236.90 |

### Accounts Not Paid.

█ The machines sold to Piermont Mines and W. R. Hall have not been paid for in full. On the Piermont Mines machine there is an unpaid balance of $844 and on the W. R. Hall machine there is an unpaid balance of $645.05. Stearns-Roger, in the account submitted (Exhibit A), deducted these items from profits. Counsel for Ruth challenged both items.

No evidence was offered to show that these accounts were uncollectible. They are therefore disallowed as deductions.

### Income Taxes.

█ Stearns-Roger claimed the right to deduct from infringing profits income taxes paid to the United States for the years 1929 and 1930.

For the year 1929 it claimed the right to deduct $1,015.80, and for the year 1930 $68.42, as that part of the taxes paid due to infringing profits. The tax for 1929 was arrived at by taking 11 per cent. of the net profit from infringing business.

The taxable profit from infringing business, according to its figures, amounted to $9,234.60. The tax for 1930 was arrived at by taking 12 per cent. of the net profit from infringing business, or $570.20.

Counsel for Ruth objected to any credit against profits for income taxes paid, on the ground that Stearns-Roger had actual notice on November 30, 1928, of the Pearce patent and that the profits were made subsequently to such date, that Stearns-Roger was doing something which it had no right to do, and that an allowance of a credit against profits would, in effect, require Ruth to pay the tax twice, since he would be required to pay an income tax on the profits in the year in which the decree was paid.

Stearns-Roger made the profits and paid the income taxes on such profits after notice was received from Ruth, but it did so under the belief that it was protected by the patents held by Minerals Separation Company; namely, the Wilkinson-Littleford patent.

The infringing profits which I have found that Stearns-Roger must account for are considerably more than the profits on which the tax was computed. However, that does not change the allowance for income taxes, since deductions from profits which have been disallowed would be proper deductions in computing taxable income. However, the allowance for 1930 must be revised, since that tax was computed on a taxable income which included the profit on the sales of parts to the Leadville Zinc Lead Company. I found that these sales did not contribute to the infringement of claims 1 and 3 of the Pearce patent.

Income taxes paid and allowable as credits against profits are shown by the following table marked L:

### TABLE L

| | | | |
|---|---|---|---|
| 1929 Tax | | | $1,015.80 |
| 1930 taxable income | | $570.20 | |
| Reduced by Leadville Zinc Lead Co. Sales in 1930 | $123.23 | | |
| Less commission | 10.16 | 113.07 | |
| Revised 1930 income | | $457.13 | |
| 1930 tax at 12% | | | 54.86 |
| Total tax paid | | | $1,070.66 |

## Reconciliation.

The following table marked M shows profits on infringing machines shown on table C:

### TABLE M

| | Gross Profit | Commissions | Profit | |
|---|---|---|---|---|
| R. D. Webb | $1,651.56 | $110.63 | $1,540.93 | |
| Colorado Zinc Lead | 1,549.03 | 106.43 | 1,442.60 | |
| Profit for 1928 | | | | $ 2,983.53 |
| Xichu Mining Co. | 2,217.98 | 154.19 | 2,063.79 | |
| International Smelting Co. | 4,552.45 | 277.11 | 4,275.34 | |
| Piermont Mines | 1,316.28 | 80.12 | 1,236.16 | |
| Climax Molybdenum Co. | 212.77 | | 212.77 | |
| Vertex Mining Co. | 827.83 | 84.28 | 743.55 | |
| Shenandoah Dives Co. | 482.52 | 32.27 | 450.25 | |
| Shenandoah Dives Co. | 5,618.07 | 386.67 | 5,231.40 | |
| Profit for 1929 | | | | 14,213.26 |
| Colorado School of Mines | 46.15 | 4.75 | 41.40 | |
| Cia Minera Fundidora | 861.41 | 49.19 | 812.22 | |
| Colorado School of Mines | 16.13 loss | | | |
| Willow Creek Mines | 120.41 loss | | | |
| Profit for 1930 | | | | 853.62 |
| W. R. Hall | 370.52 | | 370.52 | |
| Profit for 1931 | | | | 370.52 |
| Total profits on machines | | | | $18,420.93 |

The following table marked N shows profits on infringing parts shown on table E:

### TABLE N

| | Gross Profit | Commission | Profit | |
|---|---|---|---|---|
| Shenandoah Dives Mining Co. | $ 696.42 | $ 69.64 | $626.78 | |
| Profit for 1930 | | | | $ 626.78 |
| Shenandoah Dives Mining Co. | 123.90 | 12.39 | 111.51 | |
| Shenandoah Dives Mining Co. | 541.11 | 54.11 | 487.00 | |
| Profit for 1931 | | | | 598.51 |
| Shenandoah Dives Mining Co. | 14.91 | | 14.91 | |
| Shenandoah Dives Mining Co. | 1,043.43 | 104.34 | 939.09 | |
| Shenandoah Dives Mining Co. | 11.91 | | 11.91 | |
| Shenandoah Dives Mining Co. | 7.49 | | 7.49 | |
| Willow Creek Mines | 36.82 | | 36.82 | |
| Shenandoah Dives Mining Co. | 352.07 | 35.20 | 316.87 | |
| Shenandoah Dives Mining Co. | 357.71 | 35.77 | 321.94 | |
| Profit for 1932 | | | | 1,649.03 |
| Willow Creek Mines | 63.50 | | 63.50 | |
| Profit for 1933 | | | | 63.50 |
| Total profits for parts shown on Table E | | | | $2,937.82 |

The following table marked O shows profits on infringing parts shown on **table** G:

TABLE **O**

| | Gross Profit | Commis- sion | Profit | |
|---|---|---|---|---|
| American Metals **Co.** | $922.96 | $92.29 | $830.67 | |
| Rawley Mines Inc. | 217.59 | 21.75 | 195.84 | |
| Profit for 1928 | | | | $1,026.51 |
| Rawley Mines Inc. | 26.33 | | 26.33 | |
| Rawley Mines Inc. | 98.86 | | 98.86 | |
| Rawley Mines Inc. | 25.98 | | ⸰25.98 | |
| Leadville Zinc Lead **Co.** | 453.62 | 45.00 | 408.62 | |
| Chas. A. Chase | 116.89 | | 116.89 | |
| Am. Metals Co. | 740.74 | 74.07 | 666.67 | |
| Rawley Mines Inc. | 215.00 | 27.10 | 187.90 | |
| Rawley Mines Inc. | 30.42 | | 30.42 | |
| Shenandoah Dives Mining **Co.** | 120.67 | | 120.67 | |
| Rawley Mines Inc. | 13.50 | | 13.50 | |
| Am. Metals Co. | 678.42 | 67.84 | 610.58 | |
| Profit for 1929 | | | | 2,306.42 |
| Rawley Mines Inc. | 60.83 | 6.08 | 54.75 | |
| Profit for 1930 | | | | 54.75 |
| Chain O' Mines | 73.93 | | 73.93 | |
| Am. Metals Co. | 104.25 | | 104.25 | |
| Am. Metals Co. | 36.43 | | 36.43 | |
| Profit for 1932 | | | | 214.61 |
| Total profits for parts shown **on table G** | | | | $3,602.29 |

The following table marked P shows total infringing profits to be accounted for:

TABLE **P**

| | | |
|---|---|---|
| Profits from Table M | $18,420.93 | |
| Profits from Table N | 2,937.82 | |
| Profits from Table O | 3,602.29 | |
| Total | | $24,961.04 |
| Less | | |
| Am. Metals Co. parts replaced July 13, 1931 (Table F) | 183.43 | |
| Salaries shown on Table K | 1,874.10 | |
| Income tax paid | 1,070.66 | |
| | | 3,128.19 |
| Net infringing profits | | $21,832.85 |

### Damages.

Counsel for Ruth requested that the accounting on infringing machines be separated into four parts; that is, for the years 1928, 1929, 1930, and 1931. He further requested that the years 1930 and 1931 be excluded from the accounting for profits and damages be assessed thereon, if the master found that engineering fees and grouped sales expense claimed by Stearns-Roger was allowed, since under such circumstances a loss would occur in such years.

For the purpose of determining a reasonable royalty, Mr. Gordon, general manager of Stearns-Roger, was examined by counsel for Ruth. Mr. Gordon testified that 10 per cent. of the sales price of a patented article was a customary royalty in the mining business, and that 10 per cent. paid to Minerals Separation Company for the privilege of building flotation machines was a fair rate.

Since the request to exclude the years 1930 and 1931 was contingent upon whether engineering fees and the claimed items of sales expense were allowed as credits and such items have been disallowed, it need not be considered further.

### Apportionment of Profits.

Stearns-Roger insisted that the Pearce patent covered an improvement in flotation machines and that the improvement did not add new life to such machines and bring about their sale. It took the position that the real invention of Pearce was in a weir and that Ruth, Pearce's assignee, was entitled to profits on such weir and not on the entire combination, and that the burden was upon Ruth to prove the profits made on such improvement or weir. Stearns-Roger, however, assumed the bur-

den which it claimed was upon Ruth and introduced evidence, Exhibits 7 to 23, and the supporting testimony of Mr. Morey, showing the cost, sale price, and profits on the weirs sold in machines shown on table C. According to its figures, Exhibit 23, a gross profit of $80.42 was realized, with a claimed deduction for income tax and sales expense of $47.02, leaving a net profit of $33.40.

For the purpose of showing that the improvement did not add new life to the combination of which it was a part and bring about the sale of the flotation machines, two witnesses were called. Arthur J. Weinig, metallurgical engineer and director of the experimental plant at the Colorado School of Mines, testified that he had a large consulting practice with mining companies, and from time to time was called upon to make recommendations to purchasers of flotation machines; that he had studied the different types of machines and recommended to several of the companies shown on table C the Minerals Separation subaeration machine purchased. He testified that he recommended the Minerals Separation subaeration machine because it was modern, that it embodied a bubble column process, which was produced by injecting air into the machine from an outside source, and that such air could be controlled; that it had hard iron liners which reduced wear and tear, a sands hole which permitted a part of the tailings and the heavier sands to escape without forcing them up over the weir, thus causing a savings in power, ball bearings which caused a saving in power and some saving on wear and tear. He also testified that he considered the weir, and it was not the dominating thing which caused him to recommend the Minerals Separation subaeration machines. Harvey L. Tedrow's (mining engineer and manager of the Gold Hub mines) testimony was along the same lines as that of Mr. Weinig.

They both testified at considerable length on a bubble column process. No evidence was introduced concerning the value of any of these so-called differences.

Ruth offered no evidence tending to separate or apportion the profits. He insisted that claims 1 and 3 of the Pearce patent cover a new and entire combination, and that he is entitled to recover all the profits.

The evidence considered in this division of the report, as I view it, especially when read in connection with the decision of the Circuit Court of Appeals, is immaterial, for the reason that Pearce's patent covered a combination consisting of a flotation machine as a unit and not an improvement in such a machine.

## Conclusions of Law.

I find the law of the case to be that the plaintiff is entitled to a decree against the defendant for $21,832.85, the profits made by defendant company on the manufacture and sale of infringing flotation machines and parts.

Some of the questions which arose were argued very seriously, and for that reason I will attempt to set forth my views of the law on some of the more involved questions.

Counsel for Stearns-Roger contend that an infringer of a combination patent is not liable for the entire profits where the elements entering into the combination are old and well known, and the combination is also old and well known, and where patentability is imparted to it by an inventive alteration or improvement of one or more of the elements whereby the utility of the combination is increased. It is further contended that Pearce, Ruth's assignor, took a combination that was old in the art and, by making an inventive change in such combination, namely, the addition of a weir, made an improvement in such combination, and for that reason Ruth would only be entitled to profits on such improvement or weir, and then only if he carried the burden and apportioned the profits on such improvement; otherwise he would be entitled to nominal damages only.

The above statement of law was taken from Seeger Refrigerator Co. v. American Car & Foundry Co. (D.C.N.J.) 212 F. 742, 743, 749, and is without doubt correct, but it is not applicable to the facts here.

■ Where profits are made by an infringer by the use of an article patented as an entirety, the infringer is responsible to the patentee for the whole of such profits. Orr & Lockett Hdw. Co. v. Murray (C.C.A.7) 163 F. 54; Elizabeth v. Pavement Co., 97 U.S. 126, 141, 24 L.Ed. 1000; Yesbera v. Hardesty Mfg. Co. (C.C.A.6) 166 F. 120; Stromberg Motor Devices Co. v. Zenith Detroit Corp. (D.C.N.Y.) 60 F. (2d) 1074, 1075; Warren v. Keep, 155 U. S. 265, 268, 15 S.Ct. 83, 39 L.Ed. 144; Oehring v. Fox Typewriter Co. (C.C.A.2)

251 F. 584. However, he may show, and the burden is upon the infringer to show, that a portion of the profits is the result of some other thing used by him in addition to the patented article. See Orr & Lockett Hdw. Co. v. Murray, supra; Westinghouse Electric & Mfg. Co. v. Wagner Electric & Mfg. Co., 225 U.S. 604, 32 S.Ct. 691, 56 L.Ed. 1222, 41 L.R.A.(N.S.) 653; Stromberg Motor Devices Co. v. Detroit Trust Co. (C.C.A.7) 44 F.(2d) 958.

Where the patent is for an improvement and not for an entirely new article or product, the patentee is only entitled to that portion of the profits due to his patented features, and the burden is on him to make the apportionment. Garretson v. Clark, 111 U.S. 120, 4 S.Ct. 291, 28 L.Ed. 371; Seeger Refrigerator Co. v. American Car & Foundry Co. (D.C.N.J.) 212 F. 742, reversed (C.C.A.) 219 F. 565; Herman v. Youngstown Car Mfg. Co. (C.C.A.6) 216 F. 604; American Street F. M. Co. v. St. Louis Street F. M. Co. (C.C.A.8) 192 F. 121; Dowagiac Mfg. Co. v. Deere & Webber Co. (C.C.A.8) 284 F. 331; Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 645, 35 S.Ct. 221, 59 L.Ed. 398; American Can Co. v. Goldee Mfg. Co. (D.C.N.Y.) 31 F.(2d) 492; Brown v. Lanyon Zinc Co. (C.C.A.8) 179 F. 309; Dunn Mfg. Co. v. Standard Computing Scale Co. (C.C.A.6) 204 F. 617; Egry Register Co. v. Standard Register Co. (C. C.A.6) 23 F.(2d) 438.

However, if the improvement provides a new use and new market for the combination of which it is an improvement, then the patentee is entitled to all the profits. In such cases the improvement is the thing which adds new life to the combination and brings about the sale, and it is incumbent upon the patentee to show that his improvement does that very thing. Van Kannel Revolving Door Co. v. Uhrich (C. C.A.8) 297 F. 363; Goulds Mfg. Co. v. Cowing, 105 U.S. 253, 255, 256, 26 L.Ed. 987; Racine Engine & Mach. Co. v. Confectioners' M. & M. Co. (C.C.A.7) 234 F. 876; Walker on Patents (6th Ed.) p. 839.

Since the rule of the Patent Office requires a claim to include a completely operative combination (Walker on Patents, vol. 1, p. 839), it is necessary in ascertaining the measure of profits or damages recoverable in cases of infringement to regard the real nature of the invention as constituting a mere improvement in, or addition to, an old device, or, on the other hand, in a substantial sense a new and entire combination.

In Seeger Refrigerator Co. v. American Car & Foundry Co. (D.C.N.J.) 212 F. 742, 744, reversed in (C.C.A.) 219 F. 565, 569, the question of apportionment arose. The patent states: "My invention relates to improvements in a combined refrigerator and freezer, and more particularly to certain principles of construction which tend to increase the refrigerating and freezing power and to regulate the degree of temperature."

The car company had constructed and sold freight refrigeration cars embodying the principle of the patent. The Court of Appeals said: "The partition of the Quinn patent, with its peculiar openings, is only a small element in the refrigerator cars made by the defendant. These cars are made up of running gears and body, but of course the gears are so entirely distinct and so easily separable that we may lay them aside without discussion. And, even when we confine ourselves to the body alone, it seems clear that the body is composed of numerous parts that have so little to do with the peculiar openings in the partition that it would be out of the question to regard the whole profit on the body as due to the use of the partition alone."

In American Street F. Mach. Co. v. St. Louis Street F. Mach. Co. (C.C.A.8) 192 F. 121, the essence of the invention was the delivering of a flat stream of water nearly parallel to the surface of the street, and the means used was a nozzle having a narrow elongated orifice, connected with a tank above, and adjusted at such an angle that the stream of water would be nearly parallel with the street. The court held that the real invention was the nozzle and its adjustment.

In Dowagiac Mfg. Co. v. Minnesota Moline Plow Co., 235 U.S. 641, 35 S.Ct. 221, 223, 59 L.Ed. 398, the patent covered new and useful improvements in grain drills. The claims in the patent related to an arrangement of spring pressure rods in combination with certain correlated elements of the seeding part. The court, after discussing the necessity for other parts, namely, the tongue, attachments to which the horses were hitched, and feeding mechanism, said: "Only when all the parts were present and so adjusted as to perform their respective functions was the drill a practical and successful machine. In this respect no change resulted from the inven-

tion covered by the patent. It effected material improvements in one part, but did not obviate or diminish the necessity for the others."

■ See, also, Herman v. Youngstown Car Mfg. Co. (C.C.A.6) 216 F. 604; American Can Co. v. Goldee Mfg. Co. (D.C.N. Y.) 31 F.(2d) 492; Egry Register Co. v. Standard Register Co. (C.C.A.6) 23 F.(2d) 438; Dunn Mfg. Co. v. Standard Computing Scale Co. (C.C.A.6) 204 F. 617; Garretson v. Clark, supra. In all of the above cases, the entire composite structure is fairly resolvable into component parts, with some of which the patented invention has no connection, except by way of furnishing the environment in which the invention becomes useful. Some of the parts pertain to the invention and others are merely incidental. It follows that, if the invention exists in one element or one combination which of itself is not usable as a self-sufficient workable apparatus, but only as an adjunct to or feature of an operative entity, then the invention amounts to an improvement and the patentee is entitled to profits only on such improvement.

Some of the cases holding that the patents involved covered a new and entire combination are Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000; Yesbera v. Hardesty Mfg. Co. (C.C.A.6) 166 F. 120; Oehring v. Fox Typewriter Co. (C. C.A.2) 251 F. 584; Stromberg Motor Devices Co. v. Zenith Detroit Corp. (D.C. N.Y.) 60 F.(2d) 1074; · Orr & Lockett Hdw. Co. v. Murray (C.C.A.) 163 F. 54; Fifield v. Whittemore (C.C.Mass.) 33 F. 835; Warren v. Keep, 155 U.S. 265, 15 S. Ct. 83, 39 L.Ed. 144.

In Warren v. Keep, supra, 155 U.S. 265, at pages 268 and 269, 15 S.Ct. 83, 84, 39 L.Ed. 144, the court said: "But it is equally true that where the patented invention is for a new article of manufacture, which is sold separately, the patentee is entitled to damages arising from the manufacture and sale. * * * The patentee does not claim to have been the inventor of the constituents. The exclusive use of them singly is not secured to him. What is secured is their use when arranged in the process."

In Elizabeth v. Pavement Co., supra, 97 U.S. 126, at page 141, 24 L.Ed. 1000, the court said: "The parts were so correlated to each other, from bottom to top, that it required them all, put together as he put them, to make the complete whole, and to produce the desired result."

In Oehring v. Fox Typewriter Co., supra, 251 F. 584, at page 586, the court said: "The Oehring invention represented an entire revision of the entire machine and the creation of a new device in which all the operative parts contributed to produce the new result."

After an analysis of the claims with the above principles in mind, it is apparent that Pearce's invention did not lie in a single element or combination in the flotation machine which was only an adjunct to an operating entity; but that all the parts were so correlated to each other that it required them all, put together, to make the complete whole and produce the desired result. The process of maintaining a substantial level required not only a weir, but every element in the claims. A reference to the opinion of the Circuit Court of Appeals in Stearns-Roger Mfg. Co. v. Ruth, supra, will show that the court so considered the claims. The court there said: "We are of the opinion· that Pearce has simplified and increased the efficiency of the process and apparatus for flotation separation, and has made a valuable contribution to the art; that, while the elements of claims one and three are old, the combination thereof is new and an old result is produced in a more facile, economical, and efficient way."

■ Counsel for Stearns-Roger, in support of the motion to quash that part of the summons requiring an account for parts sold which contributed to claims one and three of the Pearce patent, contended that, since a user of a patented combination had the right to keep it in repair, the sale of parts· by Stearns-Roger did not constitute contributory infringement. Wilson v. Simpson, 9 How. 109, 13 L.Ed. 66, is cited in support of such contention. This would be true if the user had purchased the patented combination from the patentee. Where a patentee sells a patented article, he grants a license to the user to keep it in repair, and it is immaterial whether such user purchase his repair parts from the patentee or a stranger. Wilson v. Simpson, 9 How. 109, 129, 13 L.Ed. 66; Heyer v. Duplicator Mfg. Co., 263 U.S. 100, 44 S.Ct. 31, 68 L.Ed. 189; Goodyear Shoe Machinery Co. v. Jackson (C.C.A.) 112 F. 146, 149, 55 L.R.A. 692; Walker on Patents (6th Ed.) vol. 1, p. 427.

However, such license covers only the replacement and repair of broken and worn-out parts and does not permit a reconstruction of the machine. Wilson v. Simpson, supra. But an infringer who sells a patented article cannot grant a license to a user to keep it in repair and cannot sell repair parts to such user without being guilty of contributory infringement and consequently liable for any profits made on such repair parts. See Graham v. Mason, 10 Fed.Cas. 930, No. 5672, affirmed 23 Wall. 261, 23 L.Ed. 86; Geo. Haiss Mfg. Co. v. Link-Belt Co. (C.C.A. 3) 63 F.(2d) 479, 481. The purchaser is continuing the infringement by using it. Consequently, since the user is also an infringer and has no license to keep it in repair, any one knowingly assisting in assembling, repairing, or renewing a patented combination by furnishing some of the needed parts contributes to such infringement. Union Special Machinery Co. v. Maimin (C.C.Pa.) 161 F. 748; Thomson-Houston Electric Co. v. Ohio Brass Co. (C.C.A.6) 80 F. 712, 723; Bullock Elec. & Mfg. Co. v. Westinghouse Elec. & Mfg. Co. (C.C.A.6) 129 F. 105; National Brake & Elec. Co. v. Christensen (C.C.A.7) 38 F.(2d) 721, 723, reversing (D.C.) 18 F. (2d) 981; Gillette Safety Razor Co. v. Hawley Hdw. Co. (D.C.Conn.) 60 F.(2d) 1019, 1033. In Union Special Machinery Co. v. Maimin, supra, 161 F. 748, at page 750, the court said: "No doubt, within certain bounds, a patented article may be repaired without making the repairer an infringer (Morrin v. Robert White Engineering Works (C.C.) 138 F. 68), but not where it is done for one who is. It is only where the device in patented form has come lawfully into the hands of the person for or by whom it is repaired that this is the case. In other words, if one without right constructs or disposes of an infringing machine, it affords no protection to another to have merely repaired it; the repairer, by supplying an essential part of the patented combination, contributing by so much to the perpetuation of the infringement."

The use of the patented machine for experiments for the sole purpose of gratifying a philosophical taste or curiosity or for instruction and amusement does not constitute an infringing use. See Poppenhausen v. Falke, 4 Blatchf. 493, Fed.Cas. No. 11,279; Robinson on Patents, vol. 3, page 61. The making or using of a patented invention merely for experimental purposes, without any intent to derive profits or practical advantage therefrom, is not infringement. 48 C.J. 294.

The essence of contributory infringement lies in concerting with others in an unlawful invasion of the patentee's rights, Harvey Hubbell, Inc., v. General Co. (C.C.A.) 267 F. 564, and an intent to aid is necessary, Trico Products Co. v. Apco-Mossberg Corp. (C.C.A.1) 45 F.(2d) 594. Where a part or element of a combination is sold without authority from the patentee, with the intent and for the purpose of bringing about its use in such combination, the essence of contributory infringement is present. Bassick Mfg. Co. v. Ready Auto Sup. Co. (D.C.N.Y.) 22 F. (2d) 331; Metropolitan Device Corp. v. Williamsburg Elec. Supply Co. (C.C.A.2) 19 F.(2d) 442; Bassick Mfg. Co. v. Larkin Automotive Parts Co. (D.C.Ill.) 19 F. (2d) 939. See, also, 48 C.J. 321; Robinson on Patents, vol. 3, p. 61.

If the part sold is adapted to no other use but an infringing one, the intent is presumed, New York Scaffolding Co. v. Whitney (C.C.A.8) 224 F. 452, yet, if the article is also capable of other uses such intent must be shown affirmatively by the patentee, Edison Elec. Light Co. v. Peninsular L., P. & H. Co. (C.C.A.6) 101 F. 831. See, also, 48 C.J. 322 and 360. In addition to the intent, the parts must also be used in the infringing device, Campbell v. Kavanaugh (C.C.N.Y.) 11 F. 83, 87, but, when the parts were sold for the purpose of use in an infringing manner, it will be presumed that they have actually been so used, unless there is proof to the contrary, American Stainless Steel Co. v. Ludlum Steel Co. (D.C.N.Y.) 16 F.(2d) 823; Consolidated Rubber Tire Co. v. Diamond Rubber Co. (D.C.N.Y.) 226 F. 455, affirmed (C.C.A.) 232 F. 475. See, also, 48 C.J. 360.

I conclude, as a matter of law, that Stearns-Roger was guilty of contributory infringement with respect to those parts which were ordered and sold for use in infringing machines.

I conclude, as a matter of law, that sales of parts for machines used for experimental purposes did not constitute contributory infringement.

It has been held that, in an accounting suit where the question is one of profits, an infringer acting in good faith under an

infringing patent is entitled to a deduction for amounts paid as a royalty or license to the owner of the infringing patent. See American Nicholson Pavement Co. v. Elizabeth, 1 Fed.Cas. 691, 700, No. 309, affirmed 97 U.S. 126, 24 L.Ed. 1000; La Baw v. Hawkins, 14 Fed.Cas. 899, 901, No. 7,961; Herman v. Youngstown Car Mfg. Co. (C.C.A.6) 216 F. 604, 609; Metallic Rubber Tire Co. v. Hartford Rubber Works Co. (C.C.A.2) 275 F. 315, 322. In La Baw v. Hawkins, supra, 14 Fed.Cas. 899, at page 901, No. 7,961, the court said:

"It is a question of profits, and such payment diminishes the amount of the defendants' profits to that extent.

"The rule for the master, on a reference in such cases, is to inquire whether the defendants were acting in good faith, under another patent; and if he finds they were, to allow all necessary expenditures incurred in its use. If they are wanton infringers of the complainants' rights, and seek to justify their infringement, by the pretext of working under the protection of some other patent, which, in fact, adds nothing to the efficiency and value of the complainants' invention, other considerations come in which it is not necessary to advert to here."

The later cases allowing royalty payments as a deduction from profits are based upon Elizabeth v. Pavement Co., 97 U.S. 126, 24 L.Ed. 1000. An examination of that case in the lower court readily discloses the reason for an allowance for royalty payments. In American Nicholson Pavement Co. v. Elizabeth, 1 Fed.Cas. 703, at page 707, No. 311, the court, in holding that the Brocklebank & Trainer patent infringed the Nicholson patent, said: "If it be granted that these additions are valuable improvements, they are nevertheless merely grafted upon the Nicholson patent, and can not be used in connection with it without the consent of its owners."

In the accounting case, American Nicholson Pavement Co. v. Elizabeth, supra, 1 Fed.Cas. 691, at page 700, No. 309, the court said: "The contracts on which the profits were realized, were for the use of the Brocklebank & Trainer pavement. No other could be put down. The defendants had bargained to pay the above sum to its owner, whenever they used the patent, and, so far as it appears, had made the bargain in good faith. It was an expense necessary to be incurred, in order to fulfill their contracts. They agreed to pay, and did in fact pay, twenty cents a square yard for the Brocklebank & Trainer improvement. Perhaps the improvement did not contribute, so much as that, towards the aggregate profits of the enterprise. It is difficult to apportion in such cases. But, if it did not, is not the burden of proof here shifted, and ought not the complainant, to have shown affirmatively, that the expenditure, thus made, was unnecessary, or extravagant in amount?"

These cases indicate that, if the infringing patent has some addition, then a royalty payment is a proper allowance, unless the complainant shows the value of such addition, and then the allowance for the royalty payment should be apportioned accordingly.

However, there is another reason for disallowing the amounts paid as engineering fees as deductions from profits. Where the owner of a patent on something which infringes an older patent licenses another to use this device, and furnishes to his licensee plans and drawings for making his device, and requiring to that end the making of the device of the prior patent, without procuring, or intending to procure, the consent of its owner, that licensor is a joint infringer with his licensee of the prior patent, see Walker on Patents (6th Ed.) 556; Toppan v. Tiffany Refrigerator Car Co. (C.C.) 39 F. 420; and, where a profit is made and both licensor and licensee share in those profits, either or both can be held for the entire profits, Belford v. Scribner, 144 U.S. 488, 507, 12 S.Ct. 734, 36 L.Ed. 514. See, also, Herman v. Youngstown Car Mfg. Co. (C.C.A.6) 216 F. 604, 609.

I found that Stearns-Roger and Minerals Separation Company were coinfringers, that the engineering fee was not a royalty, but a division of profits. I therefore conclude as a matter of law that no deductions from profits should be made because of such payments.

The reduction of profits by the allowance of interest on investment is well settled. Seabury v. Am Ende, 152 U.S. 561, 569, 14 S.Ct. 683, 38 L.Ed. 553; Goulds Manufacturing Co. v. Cowing, 105 U.S. 253, 257, 26 L.Ed. 987; Oehring v. Fox Typewriter Co. (C.C.A.2) 251 F. 584, 587; Western Glass Co. v. Schmertz Wire Glass Co. (C.C.A.7) 226 F. 730, 738, 739; W. W. Sly Mfg. Co. v. Pangborn Corp. (D.C.Md.) 276 F. 971, 973, 974; Philadelphia Rubber Works Co. v. U. S. Rubber

Reclaiming Works (C.C.A.2) 277 F. 171, 179; Stromberg Motor Devices Co. v. Detroit Trust Co. (C.C.A.7) 44 F.(2d) 958, 963; Motor Player Corp. v. Piano Motors Corp. (D.C.N.J.) 19 F.(2d) 993; Permutit Co. v. Refinite Co. (C.C.A.2) 27 F.(2d) 695, 698; Producers' & Refiners' Corp. v. Lehmann (C.C.A.8) 18 F.(2d) 492, 502; Standard Scale & Supply Co. v. Cropp Concrete Machinery Co. (C.C.A.7) 6 F. (2d) 447, 451; Computing Scale Co. v. Toledo Computing Scale Co. (C.C.A.7) 279 F. 648, 678. And this is true even though the plant and other assets are not devoted entirely to the producing and selling of the infringing article. See Producers' & Refiners' Corp. v. Lehmann, supra; Computing Scale Co. v. Toledo Computing Scale Co., supra; Standard Scale & Supply Co. v. Cropp Concrete Mach. Co., supra; Oehring v. Fox Typewriter Co., supra; Western Glass Co. v. Schmertz Wire Glass Co., supra; W. W. Sly Mfg. Co. v. Pangborn Corp., supra.

However, the reason for such an allowance requires that the investment upon which the allowance is computed be actually used, wholly or in part, in the producing and marketing of the infringing product. In Seabury v. Am Ende, 152 U.S. 561, at page 570, 14 S.Ct. 683, 686, 38 L. Ed. 553, the Supreme Court said: "Nor do we say that such an allowance may not be properly made, even where the use of the plant is not wholly restricted to making the infringing article. But the evidence, in such a case, should enable the master to satisfactorily apportion the interest between the several kinds of business."

In W. W. Sly Mfg. Co. v. Pangborn Corp., supra, 276 F. 971, at page 973, the court said: "The examiner reports that the obstacles to making a fair and equitable apportionment of capital employed in the dust arrester business seem to be insurmountable, but that, at the request of defendant's counsel, he ascertained that, if the entire capital of the defendant invested in its business were apportioned in the ratio of the sale of dust arresters to total sales, interest at 6 per cent. on the proportion of capital so assumed to have been used in the dust arrester business would amount to $6,549.48. In his report he points out that such an apportionment would necessarily ignore such vital elements as that only a small part of the physical plant might have been used in the manufacture of dust arresters and the major portion for other business, or vice versa; that raw materials and supplies for use in making dust arresters might comprise much or little of the inventories on hand; that the accounts receivable might contain a great or little amount due from purchasers of dust arresters; that money borrowed on mortgage or notes payable might or might not have been used in the dust arrester portion of the business," etc.

The infringing business constituted a very small percentage of the entire business of Stearns-Roger during the years 1928, 1929, 1930, and 1931. It follows that the invested capital was used primarily in the carrying on of other than infringing business. Nevertheless, under the rule announced by the United States Supreme Court, an allowance for interest on investment must be made if the evidence discloses that a use of all or a part of the investment was used in the infringing business and it is possible to satisfactorily apportion to the infringing business its proper share of the use of such capital.

The difficulty here is that the figures used by Stearns-Roger to represent investment mean nothing as far as determining what capital was used in the infringing business. In order to use their figures on invested capital, that is, the sum of capital stock and surplus, it would be necessary to assume that every asset which Stearns-Roger owned, regardless of whether it was land, buildings, machinery, tools, cash, accounts receivable, good will, patent rights, etc., was used in carrying on the infringing business. It must be shown that the investment was actually used in carrying on the infringing business. Otherwise it would represent a fair manufacturer's return upon capital stock and surplus or a species of profit, and an infringer should not be permitted to profit out of the infringement. Coffield Motor Washer Co. v. Wayne Mfg. Co. (C.C.A.8) 255 F. 558, 561.

In computing profits, some courts have permitted income taxes on infringing profits to be deducted. See Macbeth-Evans Glass Co. v. L. E. Smith Glass Co. (C.C.A. 3) 23 F.(2d) 459, 463; Stromberg Motor Devices Co. v. Detroit Trust Co. (C.C.A. 7) 44 F.(2d) 958, 965; W. W. Sly Mfg. Co. v. Pangborn Corp. (D.C.Md.) 276 F. 971, 974, affirmed (C.C.A.) 284 F. 217. In Ellett v. Klein (D.C.Pa.) 22 F.(2d) 807, 814, and L. P. Larson, Jr., Co. v. Wm.

Wrigley, Jr., Co., 277 U.S. 97, 48 S.Ct. 449, 72 L.Ed. 800, such allowances were disallowed. In L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., supra, the court said: "No doubt there are cases in which such a deduction would be proper. * * * It would be unjust to charge an infringer with the gross amount of his sales without allowing him for the materials and labor that were necessary to produce the things sold, but it does not follow that he should be allowed what he paid for the chance to do what he knew that he had no right to do. That is the position of the Wrigley Company as we understand the findings in the successive stages of this suit."

In Stromberg Motor Devices Co. v. Detroit Trust Co., supra, 44 F.(2d) 958, at page 965, the court, in commenting on the decision in L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., supra, said: "If from this language it may be concluded that where the accounting party had been acting in good faith, and with his infringement there was no admixture of deliberation or willfulness, 'such a deduction would be proper.' If not in such a case, we fail to comprehend the significance of what was so said."

Counsel for Ruth contends that, since the profits were made subsequent to the time Ruth notified Stearns-Roger that they were infringing and the tax was paid subsequent thereto, the rule announced in L. P. Larson, Jr., Co. v. Wm. Wrigley, Jr., Co., supra, applied. I do not think so. Stearns-Roger was operating under what they thought was a valid patent. Their belief was strong enough to cause them to carry the case to the Circuit Court of Appeals. This is the same situation that existed in Stromberg Motor Devices Co. v. Detroit Trust Co. The only difficulty with making an allowance is that, when the decree is paid, Stearns-Roger will be entitled to deduct such payment from their gross profits and reduce their taxes for that year. They might also be able to secure a refund from the government for that part of the tax paid on the infringing business. I allowed a deduction from infringing profits on account of income taxes, but I recommend that such allowance be conditioned upon Stearns-Roger filing a bond in favor of Ruth in the amount of such tax allowance. The bond should be conditioned upon Stearns-Roger paying to Ruth any refund on account of such taxes and any benefit received by it in the form of a reduction in its income taxes in the year in which the decree is paid, such benefit and refund payments not to exceed the amount of the income tax allowance.

It is well settled that items of expense which are incurred in making infringing profits are proper credits against such profits. The burden is upon the plaintiff to establish such profits, and, after he has done so, defendant, if it wishes to have any offsets against such profits, must claim them. If such claimed items of expense are challenged, it becomes the further duty of defendant to prove such challenged items. Flat Slab Patents Co. v. Turner (C.C.A.8) 285 F. 257, 279; Kissinger-Ison Co. v. Bradford Belting Co. (C.C.A.6) 123 F. 91, 95; Krentler-Arnold Hinge Last Co. v. Leman (D.C.Mass.) 24 F.(2d) 423, 424; Coffield Motor Washer Co. v. Wayne Mfg. Co. (C.C.A.8) 255 F. 558. And the evidence in such a case must be more than a mere statement of a claim. Gordon v. Turco-Halvah Co. (C.C.A.2) 247 F. 487, 491; Kissinger-Ison Co. v. Bradford Belting Co., supra. Where items of expense are incurred in producing infringing and noninfringing business, the evidence must show that to be a fact. And, if possible, that portion belonging to infringing business must be ascertained. However, if it is impossible to do so, and the proof shows that to be the case, then the master may resort to a fair system of apportionment. Flat Slab Patents Co. v. Turner, supra, 285 F. 257, page 279. However, after challenge, in every case it must be shown that the overhead or other items of expense were incurred in part in producing the infringing profits. Flat Slab Patents Co. v. Turner, supra; Krentler-Arnold Hinge Last Co. v. Leman, supra.

Commissions paid to Stearns-Roger salesmen were direct items of expense and were reasonable. They are therefore proper credits against profits. Kissinger-Ison Co. v. Bradford Belting Co., supra; Flat Slab Patents Co. v. Turner, supra; Walker on Patents (6th Ed.) p. 841.

Each sale was a separate and distinct infringement, and for that reason each sale has been considered separately, and the profits on profitable sales have been reported without any deductions having been made on account of unprofitable sales. Crosby Steam Gage & Valve Co. v. Consolidated Safety Valve Co., 141 U.S. 441, 443, 12 S.Ct. 49, 35 L.Ed. 809; Canda Bros. v. Michigan Malleable Iron Co. (C.

C.A.6) 152 F. 178, 180; Permutit Co. v. Refinite Co. (C.C.A.) 27 F.(2d) 695; McKee Glass Co. v. H. C. Fry Glass Co. (C. C.A.) 248 F. 125.

At the hearing on exceptions filed to the draft report, which was served on the parties September 11, 1934, counsel for Stearns-Roger offered to assign the accounts of Piermont Mines and W. R. Hall. The profit reported on the Piermont Mines machine is $1,236.16, and the outstanding account against such company is $844. The profit reported on the W. R. Hall machine is $370.52 and the outstanding account is $645.05. If valid assignments of such accounts can be made by Stearns-Roger, I recommend that it be permitted to pay $1,214.52 of the decree by such assignments.

The exceptions are overruled. A decree may be presented in accordance with the report of the special master.